**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| **NATIONAL HERITAGE** | ) | **Case No. 09-10525-BFK** |
| **FOUNDATION, INC.** | ) | **Chapter 11** |
| | ) | |
| **Debtor** | ) | |

**MEMORANDUM OPINION**

On remand from the Fourth Circuit Court of Appeals, this Court is called upon to set forth specific findings of fact – if the record so permits – in support of the Release, Exculpation and Injunction Provisions set forth in the Debtor's Fourth Amended and Restated Plan of Reorganization.  The Court sets forth its specific findings of fact herein, and concludes that these findings do not support the Release Provisions in this case.  The Court further concludes that the findings do support the Exculpation Provisions of the Plan.  The Court's Findings of Fact and Conclusions of Law are set forth below.

**Findings of Fact**

The Court makes the following findings of fact:

**A.  The Debtor's Corporate Structure.**

1.      The Debtor was incorporated in the State of Georgia in 1994.  Third Amended Disclosure Statement at 5.[1]  It is a non-profit, public charity, exempt from taxation under Internal Revenue Code § 501(c)(3).  *Id.*

---

[1]  The Third Amended Disclosure Statement (hereinafter, "Third Am. Discl. St.") is found at Docket No. 578.  It was conditionally approved by this Court as having adequate information on September 11, 2009.  Docket No. 602. The Court's Findings of Fact based on the Third Am. Disc. St. are not contested.

2.      As of the confirmation hearing (discussed below), the Debtor's Board of Directors consisted of: Dr. Marion Houk, John T. Houk, III, Julie Ann Houk, and Dana Fenton. Confirmation Hr'g, Tr. I, p. 42.[2]

3.      As of the confirmation hearing, the officers of the Debtor were: Dr. J.T. ("Doc") Houk, II (CEO), Dr. Marion M. Houk (Chief Operations Officer), John T. ("Tick") Houk, III (President), and Jan Ridgely (Vice President).  Tr. I, p. 44.

4.      Marion Houk is the mother of Tick Houk; Tick Houk is married to Julie Houk. *Id.* at 65.  Marion Houk is the wife of Doc Houk, the CEO.  *Id.* at 65-66.  Jan Ridgely is the daughter of Doc and Marion; Tick is her brother, also the son of Doc and Marion Houk.  *Id*. at 66.

5.      In all, the Houk family controlled three out of four board seats, and all of the officer positions of the Debtor.  *Id.*

6.      Dana Fenton is the sole director who is not related to the Houk family.

7.      Within the year preceding the confirmation hearing, the Debtor had 17 full-time employees.  As of the confirmation hearing, the Debtor had 10 full-time employees.  Tr. I, p. 46.

8.      Prior to its bankruptcy filing, the Debtor received on average approximately $11,000,000 to $12,000,000 per year in donor contributions.  *Id.* at 54.  The Debtor expected to receive approximately $6,000,000 in a combination of gifts and income for the year 2010.  *Id.* at 55.

9.      As of December 31, 2008, the Debtor managed net assets with a book value of $152,000,000, which was allocated to 6,014 donor advised funds.  Third Am. Discl. St. at 5.

---

[2]   The transcripts of the confirmation hearing, held on October 15 and 16, 2009, are referred to herein as Tr. I and Tr. II, respectively.

10.     In the late 1990's and early 2000's, the Debtor entered into 114 charitable gift annuity ("CGA") contracts.  *Id*. at 6.

11.     In the case of each CGA, there is one Annuitant (in the case of a one-life CGA) or two Annuitants (in the case of a two-life CGA), consisting of the Annuitant and the Annuitant's spouse.  *Id.*  The Annuitants are creditors of the Debtor.

12.     As of the filing of the Debtor's petition, the Debtor owed approximately $1.64 million in annual payment obligations to the Annuitants and their spouses, out of approximately $12 million to $15 million in total annuity obligations.  *Id.*

**B.  The Events Leading to the Debtor's Chapter 11 Filing.**

13.     In the late 1990's the Debtor accepted charitable contributions involving "split dollar" life insurance policies.  Third Am. Discl. St. at 7.  In 1999, Congress enacted I.R.C. Section 170(f)(10), which precluded split dollar life insurance policies for purposes of charitable giving.  *Id*.

14.     Two individuals who had made split dollar life insurance charitable contributions to the Debtor, Dr. Juan and Silva Mancillas, sued the Debtor in State Court in Texas.  *Id.* at 7. The State Court awarded damages to Dr. and Mrs. Mancillas, in an amount in excess of $6 million.  *Id.* at 8.

15.     Unable to obtain an appeal bond in order to stay enforcement of the Judgment, the Debtor filed its voluntary petition in bankruptcy in this Court on January 24, 2009.  *Id.*

**C.  The Debtor's Objections to Claims.**

16.     This Court set a Bar Date for the filing of Proofs of Claim of June 3, 2009. Docket No. 32.

3

17.     In all, 343 Proofs of Claim were filed in the case.  In total, the claims amounted to $51,512,086.79.  This amount includes a secured claim filed on behalf of Virginia Heritage Bank (Claim No. 45-1), in the amount of $7,530,588.86.

*1.   The Annuitants' Claims.*

18.     Pursuant to two Orders, entered on April 28, 2009 (Docket No. 165), and August 31, 2009 (Docket No. 556), the Court authorized the Debtor to pay 85% of the outstanding amounts due, both pre-petition and post-petition, to the Annuitants.

19.     On September 8, 2009, the Debtor filed a Motion to Establish Procedures for the estimation of the Annuitants' claims.  Docket No. 590.

20.     On September 25, 2009, the Court entered an Order establishing procedures for the estimation of the Annuitants' Claims, and establishing the amounts of the Annuitants' claims at the present value of the payments that each Annuitant would receive for the remainder of the Annuitants' lives.  Docket No. 639.

*2.   The Donor Claims.*

21.     Beginning on August 1, 2009, the Debtor filed a series of Objections to Proofs of Claim filed by the Donors (the "Donor Claim Objections").  The basis for these Objections was that the Donors had parted with legal title to the donated funds, and therefore, the Donors were not creditors of the Debtor.  *See*, *e.g.,* Docket No. 273.[3]

22.     On September 28, 2009, the Court entered an Order sustaining the Debtor's Objections to the Donor Claims.  Docket No. 641.  That Order was later amended, for purposes of clarifying precisely which claims were disallowed.  Docket No. 652 (the "Clarifying Order").

---

[3]  Under the Bankruptcy Code, a "creditor" is defined, *inter alia*, as an "entity that has a claim against the debtor." 11 U.S.C. § 101(10)(A).  A "claim" is defined as either a "right to payment," or a "right to an equitable remedy for breach or performance if such breach gives rise to a right to payment."  11 U.S.C. § 101(5).

23.     Specifically, the Clarifying Order provided that certain Donor Claims – those identified as Claim Nos. 54, 68, 86, 142, 226, 240, 242, 251 and 276, were not disallowed claims.  Docket No. 652.  The Highbourne Foundation Claim (Claim No. 142) and the Townsley Claim (Claim No. 240) were among the claims disallowed originally in the Order of September 28, 2009, but were removed from the list of disallowed claims, with the entry of the Clarifying Order.  *Id.*

24.     For purposes of the Debtor's Fourth Amended Plan, these specific claims (Nos. 54, 68, etc.) were identified as the "Pending Donor Claims," and were treated as allowed claims under Class III(C) (Other General Unsecured Claims).  *See* Fourth Am. Plan at 8.

*3.   The Highbourne Foundation Claim.*

25.     On May 26, 2009, the Highbourne Foundation filed Proof of Claim No. 142-1, in the amount of $626,332.50, as a Donor claim.  The Proof of Claim stated: "custodial account held by NHF."  The claim was filed under the name of the Highbourne Foundation; no separate claim appears to have been filed by John and Nancy Behrmann.

26.     The Debtor objected to this claim, as a Donor Claim Objection, on August 2, 2009.  Docket No. 341.

27.     The Highbourne Foundation amended this claim on September 5, 2009, as Claim No. 142-2.  The Amended Claim amended the amount slightly, to $643,396.05, and stated as the basis of the claim: "Rescission of Donations."

28.     The Debtor objected to the Amended Claim on December 22, 2009.  Docket No. 811.

29.     On June 29, 2010, John and Nancy Behrmann filed a pleading withdrawing Claim No. 142.  Docket No. 948.

*4.   The Townsley Family Foundation Claim.*

30.    On June 2, 2009, Maurice Townsley and the Townsley Family Foundation filed

Proof of Claim No. 240, in the amount of $1,200,000.  The basis of the claim was stated to be:

"Donor Directed Townsley Foundation Cash."

31.    On August 2, 2009, the Debtor filed an Objection to Claim No. 240, as one of the

Donor Claim Objections.  Docket No. 409.

32.    The Debtor filed a Motion to disallow this claim on December 22, 2009.  Docket

No. 809.

33.    On January 29, 2010, Maurice Townsley, Theresa Townsley, and the Townsley

Family Foundation filed a pleading withdrawing their claim.  Docket No. 853.

*5.   The Dodie Anderson Foundation Claim.*

34.    On October 6, 2009, Dolores F. Anderson, aka Dodie Anderson, and the Dodie

Anderson Foundation, filed Proof of Claim No. 341-1, in the amount of $1,010,796.  The

asserted basis for the claim was "Rescission of contribution."

35.     On the same day, Ms. Anderson filed a Motion for leave to file the claim as a late

claim.  Docket No. 645.

36.    On October 15, 2009, the Debtor filed an Objection to the Anderson Claim.

Docket No. 675.  The Objection asserted that: (a) the claim was not timely filed; and (b) the

claim, as a Donor claim, should be disallowed for the same reason as the other Donor claims,

i.e., the Donor had parted with legal title to the funds, and the Debtor therefore was not indebted

to the claimant.  *Id.*

37.    On November 19, 2009, the Court entered an Order disallowing the Dodie

Anderson Foundation Claim as having been untimely filed.  Docket No. 744.

6

**D.  Confirmation of the Debtor's Chapter 11 Plan.**

38.      On September 11, 2009, the Court conditionally approved the Debtor's Third

Amended Disclosure Statement.  Docket No. 602.

39.      The Plan was supported by the affirmative vote of its only impaired class, that of

Class III(B).  Debtor's Summary of Ballots, Docket No. 670.  Class III(B) consisted of the

claims of the Annuitants.

40.      Of the 85 Ballots returned in Class III(B), 82 voted in favor of the Plan, 1 voted

against, and 2 were unmarked.  *Id.*  Of the $12,651,909 in dollar amount in Class III(B),

$12,334,531, or 97.5%, voted in favor of the Plan.  *Id.*

41.      The Donor Claims (other than the Pending Donor Claims), having been

disallowed by the Court (Docket Nos. 641 and 652), were not counted for purposes of

confirmation of the Debtor's Fourth Amended Plan.  Specifically, all Donor Claims other than

Claim Nos. 54, 68, 86, 142, 226, 240, 242, 251 and 276, were not allowed to vote under the Plan.

Debtor's Fourth Am. Plan, § 6.1 ("The Donors are not creditors of the Debtor.").

42.      The Pending Donor Claims (Claim Nos. 54, 68, etc.) were considered to be a part

of Class III(C).  *Id.*  Class III(C) was unimpaired under the Plan.  The Pending Donor Claims,

therefore, were not entitled to vote, as well.[4]

43.      The Fourth Amended Plan contained certain Release, Injunction and Exculpation

Provisions, at Sections 7.19, 7.20 and 7.21.

44.      Section 7.22 of the Plan also provides:

Indemnification.  The Debtor and the Reorganized Debtor shall indemnify and
hold harmless all members, officers, directors, advisors, attorneys, affiliates,
representatives, agents, financial advisors or employees to the fullest extent

---

[4]  Under Bankruptcy Code Section 1126(f), classes of claims that are unimpaired are conclusively deemed to have
accepted the Plan, and hence, are not entitled to vote.

available under applicable law or the Debtor or Reorganized Debtors [sic] organizational documents.

45.     The Highbourne Foundation, the Anderson Foundation and the Townsley

Foundation all objected to the Release, Injunction and Exculpation Provisions of the Plan, and

argued against approval of the Release, Injunction and Exculpation Provisions at the

confirmation hearing.[5]

46.     Jan Ridgely testified as the Debtor's representative at the confirmation hearing.

She testified that she believed that the Release, Injunction and Exculpation Provisions were

"necessary." Tr. I, p. 60.  She testified that there was "concern" among the officers and directors

that they could be sued, and that no one wanted the threat of litigation hanging over them moving

forward.  *Id.*  She further testified that, in her view, the Release, Injunction and Exculpation

Provisions were "essential to the success of the reorganized debtor," and that the failure to

include the Release, Injunction and Exculpation Provisions could render the officers and

directors of the Debtor unwilling to serve.  *Id*. at 61.  She testified that she was very concerned

that other Donors "may come forward after the bankruptcy" in order to bring suit against the

officers and directors.  *Id*. at 62.

47.     On the other hand, Ms. Ridgely testified that none of the officers and directors

actually had come forward to say that they would not serve if they did not have the benefit of the

Release, Injunction and Exculpation Provisions.  *Id*. at 63.

48.     The Debtor's Bylaws provide for the indemnification of its officers and directors,

to the fullest extent of the Georgia Non-Profit Corporation Code.  *See* Tr. I, pp. 91-92.

---

[5]   As noted above, the Debtor objected to the Highbourne, Townsley, and Anderson claims after the Plan was confirmed.  The Court sustained the Debtor's Objections to the Anderson claim; the Highbourne and Townsley claims were withdrawn.

49.     After hearing argument on the matter, the Court ruled that the Release, Injunction

and Exculpation Provisions would be approved, though in a form that reduced the scope of the

Release, Injunction and Exculpation Provisions.  Tr. I, p. 141; Tr. II, pp. 4-15.

50.     On October 16, 2009, after a contested confirmation hearing, the Court entered an

Order confirming the Debtor's Fourth Amended Plan.  *See* Docket No. 687.  The Confirmation

Order provides:

> Releases and Discharges. The releases, exculpation, and injunction provisions
> described in Sections 7.19, 7.20, and 7.21 of the Plan are essential to the Debtor's
> reorganization efforts and appropriate given the Debtor's unique circumstances.
> Each of the discharge, release, indemnification and exculpation provisions set
> forth in the Plan: (i) is within the jurisdiction of the Court under 28 U.S.C.
> §§1334(a), (b), and (d); (ii) is an essential means of implementing the Plan
> pursuant to section 1123(a)(5) of the Bankruptcy Code; (iii) is an integral element
> of the transactions incorporated into the Plan; (iv) confers material benefit on, and
> is in the best interest of, the Debtor, its Estates and their creditors; (v) is important
> to the overall objectives of the Plan to finally resolve all Claims among or against
> the parties-in-interest in Debtor's case with respect to the Debtor's organization,
> capitalization, operation and reorganization; and (vi) is consistent with sections
> 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

Docket No. 687, pp. 15-16.

51.     The Release, Injunction and Exculpation Provisions were amended, in accordance

with the Court's ruling at the confirmation hearing, to provide as follows:

> **7.19 Release. On the Effective Date, the Debtor, Reorganized Debtor, the
> Committee, the members of the Committee and their designated
> representatives in their capacity as such, any of such parties' respective
> current (i.e., as of the Confirmation Date) officers, directors or employees,
> and any of such parties' successors and assigns (the "Released Parties") shall
> not have or incur, and are hereby released from, any claim, obligation, cause
> of action, or liability to any party in interest who has filed a claim or who was
> given notice of the Debtor's Bankruptcy Case (the "Releasing Parties") for
> any act or omission before or after the Petition Date through and including
> the Effective Date in connection with, relating to, or arising out of the
> operation of the Debtor's business, except to the extent relating to the
> Debtor's failure to comply with its obligations under the Plan.
> Notwithstanding the foregoing, nothing contained herein shall be deemed to**

be a release by the Debtor or Reorganized Debtor of any of the Causes of Action retained by the Debtor pursuant to the Plan including, without limitation, the Causes of Action described on Exhibit C to the Disclosure Statement.

**7.20 Injunction.** The satisfaction, releases, and discharge pursuant to Article VII of this Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any claim or cause of action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

Except as provided in this Plan or as expressly approved by the Reorganized Debtor, the Releasing Parties (as defined in Section 7.19) shall be precluded and enjoined from asserting against the Reorganized Debtor, the Estate or the Reorganized Debtor's Assets, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

**7.21 Exculpation.** The Released Parties shall have no liability to any of the Releasing Parties (as defined in Section 7.19) for any act taken or omission made in connection with, or arising out of, the Bankruptcy Case, the Disclosure Statement, this Plan or the formulation, negotiation, preparation, dissemination, implementation or the administration of this Plan, any instrument or agreement created or entered into in connection with this Plan, any other act taken or omitted to be taken in connection with, or in contemplation of, any of the restructuring or other transactions contemplated by this Plan, and the property to be distributed or otherwise transferred under this Plan; unless such person obtains the prior approval of the Bankruptcy Court to bring such a claim. Nothing in this Section 7.21 or elsewhere in this Plan shall release, discharge or exculpate any non-Debtor party from (a) any claim owed to the United States government or its agencies, including any liability arising under the Internal Revenue Code or criminal laws of the United States, or (b) any claim of any Claimant except as expressly set forth herein.

Docket No. 687, pp. 27-28.[6]

---

[6]  Oddly, the following sentence, initially included in Section 7.19 of the Plan, was deleted from the language approved in the Confirmation Order: "Notwithstanding the foregoing, nothing contained herein shall release any claim for contribution or indemnification by a Released Party against a Released Party." Plan at 19, § 7.19.  Thus, absent Section 7.22 of the Plan, an argument could be made that the officers' and directors' claims for indemnification were released by the very Release Provision on which they rely.  However, the inclusion of Section 7.22 in the Plan makes it plain that the Debtor has continuing indemnity obligations to its officers and directors.

52.     The Plan called for the payment in full of all of the Annuitant Claims.  *See* Fourth

Am. Plan at 11-12.  The Plan does not provide for the payment of any of the Donor Claims, other

than the Pending Donor Claims.  *Id.* at 12-14.

53.     The confirmed Plan also contains a Severability provision, Section 12.2, which

states as follows:

> Severability.  Should any provision in this Plan be determined to be unenforceable, that
> determination will in no way limit or affect the enforceability and operative effect of any
> other provision of this Plan.  The Confirmation Order shall constitute a judicial
> determination and shall provide that each term and provision of this Plan, as it may have
> been altered or interpreted in accordance with the foregoing, is valid and enforceable
> pursuant to its terms.

*Id.* at 23.

### E.  The Appeal and the Remand from the Fourth Circuit.

54.     The Highbourne Foundation, the Anderson Foundation and the Townsley

Foundation noticed an appeal of the Confirmation Order on October 23, 2009.  Docket No. 709.

55.     The United States District Court for the Eastern District of Virginia affirmed the

Confirmation Order on August 17, 2010.  Docket No. 956.

56.     On December 9, 2011, the Fourth Circuit reversed and remanded the case to the

District Court, holding that the record was insufficient to determine on appeal whether the

Release, Injunction and Exculpation Provisions should, or should not, have been approved.

Docket No. 986.  The District Court, in turn, remanded the case to this Court on January 31,

2012.  Docket No. 989.

57.     At a status conference before this Court on March 6, 2012, the parties agreed that

the Court did not need to reopen the record for additional evidence.  The parties stipulated that

the Court could, and should, make its findings of fact and conclusions of law based on the record

11

as it stood at the conclusion of the confirmation hearing. The Court accepted their stipulation

that the record is sufficient.[7]

**Conclusions of Law**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of

Reference of the United States District Court for the Eastern District of Virginia of August 15,

1984. This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(L) ("confirmation of plans").

The Court will first address the Release Provisions of Section 7.19, and then the

Exculpation Provisions of Section 7.22. The Injunction Provisions of Section 7.21 are discussed

last.

**I.      The Release Provisions (Section 7.19).**

In its Opinion remanding the case to this Court, the Fourth Circuit noted that non-debtor

releases, while allowable, should be granted "cautiously and infrequently." *Behrmann v. Nat'l*

*Heritage Found., Inc*., 663 F.3d 704, 712 (4th Cir. Va. 2011) (citing *Deutsche Bank AG v.*

*Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d

Cir. 2005) ("No case has tolerated nondebtor releases absent the finding of circumstances that

---

[7]   There is one other set of facts worth noting here, but that, in the end, is not determinative of any of the issues before the Court. In Schedule B to the Debtor's Third Amended Disclosure Statement, the Debtor listed a policy of directors and officers liability insurance listed as an executory contract, issued by Philadelphia Indemnity Insurance Co. (the Debtor's "D&O Policy"), which was assumed by the Debtor as a part of the confirmation process. *See* Docket No. 577, Ex. B, p. 7. On April 23, 2012, the Reorganized Debtor filed a Complaint for a determination of coverage with the U.S. District Court for the Eastern District of Virginia against Philadelphia Indemnity Insurance Company. *See Nat'l Heritage Found., Inc. v. Philadelphia Indem. Ins. Co.*, Civil No. 1:12cv00447. In the Complaint, the Reorganized Debtor alleges that: (a) the Amended Highbourne Claim filed in the bankruptcy case is a Claim under the Policy as a D&O Wrongful Act (Complaint, ¶ 53); (b) the Townsley Claim is a Claim under the Policy as a D&O Wrongful Act (Complaint, ¶ 78); and (c) the Anderson Claim is a Claim under the Policy as a D&O Wrongful Act (Complaint, ¶ 125). The Complaint also alleges that the Reorganized Debtor settled the Highbourne Claim for $590,000, and the Townsley claim for $929,491. Complaint, ¶¶ 60, 77. It is unclear whether these amounts have been paid. The Complaint alleges that the Reorganized Debtor "proceeded to resolve" the Amended Highbourne Claim. *Id.* at ¶ 63. The Complaint alleges that the Townsley claim was settled, *id.* at ¶ 77, but does not state whether the settlement amount has been paid. The Anderson claim is not alleged to have been settled. Philadelphia Indemnity, for its part, has denied liability to NHF, and claims that any further liability with respect to these claims was released in connection with a previous settlement with NHF.

12

may be characterized as unique."); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002) ("[S]uch an injunction is a dramatic measure to be used cautiously."); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 212-13 (3d Cir. 2000) (non-debtor releases have been approved only in "extraordinary cases")).

In discussing the propriety of third party releases, the Second Circuit stated that:

> Courts have approved nondebtor releases when: the estate received substantial consideration, *e.g., Drexel Burnham,* 960 F.2d at 293; the enjoined claims were "channeled" to a settlement fund rather than extinguished, *MacArthur Co. v. Johns-Manville Corp.* ( *In re Johns-Manville Corp.*), 837 F.2d 89, 93-94 (2d Cir. 1988); *Menard-Sanford v. Mabey* ( *In re A.H. Robins Co.*), 880 F.2d 694, 701 (4th Cir. 1989); the enjoined claims would indirectly impact the debtor's reorganization "by way of indemnity or contribution," *id.*; and the plan otherwise provided for the full payment of the enjoined claims, *id.* Nondebtor releases may also be tolerated if the affected creditors consent. *See In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir. 1993).

*In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142.

The Fourth Circuit further found the factors in *Dow Corning* and *In re Railworks* to be instructive, and commended these cases to this Court for consideration. *Nat'l Heritage Found., Inc.*, 663 F.3d at 712 (referencing the factors laid out in *Dow Corning*, 280 F.3d at 658, and *Hoges v. Moore (In re Railworks Corp.)*, 345 B.R. 529, 536 (Bankr. D. Md. 2006)). In *Dow Corning*, the Sixth Circuit identified the following seven factors:

> (1)  There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

280 F.3d at 658.

The Fourth Circuit, citing to the Appellee's (the Debtor's) Brief, described the factors in

*Railworks* as follows:

> (1) [O]verwhelming approval for the plan; (2) a close connection between the
> causes of action against the third party and the causes of action against the debtor;
> (3) that the injunction is essential to the reorganization; and (4) that the plan of
> reorganization provides for payment of substantially all of the claims affected by
> the injunction.

*Nat'l Heritage Found., Inc.*, 663 F.3d at 712 (citing Appellee's Brief at 25-26).

The *Railworks* decision involved the application of release provisions in an already-

confirmed Plan.  It is, in essence, a decision about permissive abstention.  345 B.R. 529.  In

*Railworks*, the Bankruptcy Court had already confirmed the Debtor's plan, which included

release provisions.  *Id.* at 535.  The officers of the company were guarantors on certain surety

bonds issued by Liberty Mutual.  *Id.* at 534.  They were sued in the State courts of California.

*Id.* at 533.  They removed the case to the Bankruptcy Court, which then transferred it to the

Bankruptcy Court in Maryland, where the Debtor's plan of reorganization was confirmed.  *Id.* at

533-34.  Ultimately, the Bankruptcy Court enjoined the prosecution of certain claims, which is to

say, it enforced the already-approved release provisions in the Debtor's plan.  *In re Railworks*,

345 B.R. at 537-38.  It remanded a number of other claims to the State court, because those

claims were not barred by the release language in the plan (the release provided an exception for

any "acts or omissions to act involving willful misconduct, recklessness or gross negligence").

*Id.* at 536.  The four-factor test employed in *Railworks*, cited above, is basically a shortened

version of the seven-factor test in *Dow Corning,* to which the Court will now turn.

14

Putting aside the last factor in *Dow Corning* (the specific findings of fact in support of the non-debtor releases, which this Court will now endeavor to provide), the Court looks to the remaining six factors.

> 1. *Whether there is an Identity of Interests Between the Debtor and the Third Parties.*

The Court finds that there is an identity of interests between the Debtor and its officers and directors, which arises out of the indemnity and advancement obligations of the corporation to its officers and directors. This, along with the overwhelming creditor support and the availability of a recovery from other sources, was an important factor in *A.H. Robins*. In affirming the grant of a preliminary injunction against the officers and directors in *A.H. Robins*, the Fourth Circuit held:

> [T]here are cases [under 362(a)(1)] where a bankruptcy court may properly stay the proceedings against non-bankrupt co-defendants but, … in order for relief for such non-bankrupt defendants to be available under (a)(1), there must be "unusual circumstances" and certainly " '[s]omething more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties.'" This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.

788 F.2d 994, 999 (4th Cir. 1986) (quoting *GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983)).[8]

---

[8]  The Court makes no findings of the merits, or lack thereof, of any of the Donor claims against the Released Parties, nor with respect to any defenses the Released Parties might assert in defense of such claims (other than, as stated in this Opinion, with respect to the Release, Exculpation and Injunction Provisions).

The Debtor has indemnity obligations to the officers and directors, by virtue of its

Bylaws, to the fullest extent of the Georgia Non-profit Corporation Code.  These indemnity

obligations were assumed in Section 7.22 of the Plan.  Under Georgia law, a non-profit

corporation may provide for the indemnity of its officers and directors to the fullest extent of the

law.  Ga. Code § 14-3-858(a) ("A corporation may, by a provision in its articles of incorporation

or bylaws or in a resolution adopted or a contract approved by its board of directors or members,

obligate itself in advance of the act or omission giving rise to a proceeding to provide

indemnification or advance funds to pay for or reimburse expenses consistent with this part.");

Ga. Code § 14-3-856(a)(2) (Officers are entitled to indemnification and advancement of

expenses to the same extent as a director, and if he or she is not a director, "to such further extent

as may be provided by the articles of incorporation, the bylaws, [or] a resolution of the board of

directors.").

As in other States, the right to indemnity is circumscribed by the Georgia Non-Profit

Corporation Code.  Specifically, directors are not entitled to indemnity unless: (1) he or she

"conducted himself or herself in good faith;" and (2) he or she reasonably believed, "[i]n the case

of conduct in his or her official capacity, that his or her conduct was in the best interests of the

corporation," and in all other cases, "that his or her conduct was at least not opposed to the best

interests of the corporation."  Ga. Code § 14-3-851(a)(1)-(2).  Similarly, officers of the

corporation are entitled to indemnity, unless their acts or omissions "involve intentional

misconduct or a knowing violation of the law."  Ga. Code § 14-3-856(a)(2)(B).

Of course, the corporation cannot know, when presented with a demand for indemnity,

whether its directors' or officers' conduct comports with the above statutory standards.  The

Non-Profit Corporation Code, therefore, provides for the advancement of legal fees and

16

expenses.  To obtain an advancement, the director or officer must provide: (1) a written

affirmation of his or her good faith belief that he or she has met the statutory standards; and (2)

his or her "written undertaking to repay the funds advanced," in the event that it is ultimately

determined that he or she "is not entitled to indemnification."  Ga. Code § 14-3-853(a)(1)-(2).

Importantly, the undertaking described here "need not be secured and may be accepted without

reference to the financial ability of the director to make repayment."  Ga. Code § 14-3-853(b).[9]

Should the Release Provisions be excised from the Plan, there is a very real possibility

that the officers and directors will be sued by the Donors, whose numbers run into the thousands.

The officers and directors would then look to the Debtor for indemnification, which would

include, among other things, an advancement of legal fees to pay their expenses in defending the

Donor claims.  While the officers and directors would have to (a) certify that their actions were

taken in good faith and in accordance with the statutory standards; and (b) undertake to repay the

expenses if it were found that their actions did not comport with their duties to the corporation,

any promise to repay would be unsecured.  Further, the statute provides that the decision to

advance expenses may be made without reference to their financial ability to repay.  Ga. Code §

14-3-853(b).  Thus, the officers and directors would be entitled to the advancement of their legal

fees and expenses, all without any security, and without any reference to their ability to repay

such amounts.

The real possibility – indeed, the near certainty – of multiple Donor lawsuits, coupled

with the officers' and directors' rights to indemnification and the advancement of legal expenses,

could have a materially negative impact on the Debtor's ability to successfully complete its

reorganization.  This factor weighs in favor of approval of the Release Provisions.

---

[9]   Ga. Code § 14-3-853 applies, by its terms, to directors.  Ga. Code § 14-3-856(a)(1) provides that a corporation
may indemnify and advance expense to an officer "to the same extent as a director."

>2.    *Whether the Non-debtors Have Contributed Substantial Assets to the Reorganization.*

In this case, the officers and directors have not contributed any assets to the reorganization.  The Debtor suggests that the officers and directors contributed by performing their duties in the reorganization effort.  The Court finds that the officers and directors, all of whom are insiders, performed their duties either because they were paid to do so (in the case of the officers), or because they had a fiduciary obligation to do so (in the case of the directors).  *See in re SL Liquidating, Inc.*, 428 B.R. 799, 804 (Bankr. S.D. Ohio 2010) ("[T]he described efforts of the directors and officers is consistent with their preexisting fiduciary duties and job responsibilities.").

In an analogous context, the Supreme Court held that so-called "sweat equity" is not sufficient to establish a new value contribution for the purpose of plan confirmation.  *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 203, 108 S.Ct. 963, 967, 99 L.Ed.2d 169, 177 (1988).  Accordingly, the Court finds that the officers and directors have not made any financial contribution in this case.  This factor weighs against approval of the Release Provisions.

>3.    *Whether the Injunction is Essential to Reorganization.*

Here, the Debtor claims that the officers and directors might leave the company if they are not protected by the Release Provisions.  NHF's Brief at 8 ("NHF's officers and directors might be unwilling to continue to serve . . .").  One commentator has referred to this theory – where the non-debtor parties threaten to leave if they are not afforded releases – as the "throw in the towel" theory.  Peter M. Boyle, *Non-Debtor Liability In Chapter 11: Validity of Third-Party Discharge In Bankruptcy*, 61 Fordham L. Rev. 421, 447 (1992).  This commentator contended that

18

[t]here is little reason, however, to succumb to such threats.  When the debtor is the officer's best employment opportunity, the officer will stay regardless of whether the discharge is granted.  In the event that the officer leaves to work elsewhere, the officer's liability will be unaffected by his or her departure from the debtor, and may even grow.

*Id.*

None of the officers said that they would in fact leave.  Tr. I, p. 63.  Further, three out of the four directors, and all of the officers, are members of the Houk family.  It is unlikely, in the Court's view, that the members of the Houk family will abandon ship, owing solely to the assertion of any claims by the Donors.

Moreover, the officers and directors – because of the claims that arose before bankruptcy – have *already* been exposed to whatever potential liability they might have to the Donors.  Even if the officers and directors left, they would still be exposed to the same potential liabilities, and they would have the same indemnification and advancement rights against the Debtor.  Only if the officers and directors perceived themselves to be *increasing* their risks by continued employment with the Debtor would they choose to leave (unless, for reasons unrelated to the indemnification issue, another opportunity presented itself that was more attractive than continued employment with the Debtor).  It is possible that, in staying put, the officers and directors might in fact perceive their risks to be increasing by virtue of the way that the Debtor conducts its business on a post-confirmation basis.  But, if that is the case, there is nothing this Court can, or should, do to help them.

In fairness, it is possible that the Debtor might have difficulty attracting new officers and directors if its current officers and directors face substantial liabilities arising out of their employment with the company.  No evidence was presented at the confirmation hearing,

however, of the Debtor's need to attract new officers and directors, and how the inclusion or

exclusion of the Release Provisions might affect that need.

The Court concludes that the Release Provisions are not essential to the Debtor's efforts

to retain its officers and directors. This factor, likewise, weighs against approval of the Release

Provisions.

4. *Whether the Impacted Class Voted Overwhelmingly to Accept the Plan.*

In the Court's view, this factor has always been something of a red herring in this case.

The Debtor's Memorandum of Law in support of confirmation identified one factor as being:

"whether the plan provides for the payment of substantially all the claims affected by the

release," and then stated in support of this factor: "the Debtor's Plan proposes to fully satisfy the

claims of all of its outstanding creditors." Docket No. 666, pp. 18-19. *See also* Tr. I, p. 111

("[W]e have a plan that is overwhelmingly approved by the creditors."). Presently, the Debtor

makes the same argument: "NHF's creditors overwhelmingly voted in support of the Plan."

NHF's Brief in Support of Issuance of Supplemental Findings at 18 (Apr. 10, 2012). In making

this assertion, though, the Debtor is referring to the allowed Annuitant claims under Class III(B),

and not to any of the disallowed Donor claims. *Id.* at 20.

It is clear that in *Dow Corning*, the Sixth Circuit (and the Fourth Circuit, by reference to

*Dow Corning* in this case) was referring to acceptance *by the impacted class*. 280 F.3d at 658.

In the recently decided case of *In re Lower Bucks Hospital*, the Bankruptcy Court stated:

> A critical factor in assessing the confirmability of a plan that includes a third-
> party release is whether the adversely affected class of creditors have manifested
> their strong support for the plan through the plan voting process. In this respect,
> the chapter 11 process provides the opportunity for the adversely affected
> constituency (here, the Bondholders) to make a threshold decision whether they
> believe the plan is in their best interests, *i.e.,* to decide whether the benefits of the

proposed plan outweigh the drawbacks of the third-party release and to bind a
minority of holders within the class who disagree.

*In re Lower Bucks Hosp.*, --- B.R. ----, No. 10-10239-ELF, 2012 WL 1655596, at *29  (Bankr.

E.D. Pa. May 10, 2012) (citations omitted).  *See also in re Tribune Co.,* 464 B.R. 126, 186

(Bankr. D. Del. 2011) (Consent requires "an agreement by a substantial majority of creditors to

support the injunction, *specifically if the impacted class or classes 'overwhelmingly' votes to*

*accept the plan.*") (emphasis added); Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent*

*in Bankruptcy*, 83 Am. Bankr. L.J. 663, 727 (2009) ("In light of § 524(e), historical

understandings and practices with regard to proper scope of third-party releases, and more

general policy considerations, it is difficult to justify extending the cram down power to

encompass discharge of claims against third parties over the objections of an entire dissenting

class.").  Here, the class impacted by the Release Provisions (the Donors) did not vote to accept

the Plan; rather, the class that was to be paid in full under the Plan (the Annuitants) voted to

accept the Plan.

　　The matter can further be illustrated by reference to *A.H. Robins*.  In *A.H. Robins*, the

Fourth Circuit approved the inclusion of a permanent injunction provision in the Plan.  *In re A.H.*

*Robins Co.*, 880 F.2d 694.  The Plan was approved by 94% of the 139,605 personal injury

claimants.  *Id.* at 698.  The Fourth Circuit found that where, among other factors, there was

overwhelming creditor support by the class of claims affected by the permanent injunction, the

injunction was proper.  *Id.* at 702 ("In this situation where the Plan was overwhelmingly

approved, where the Plan in conjunction with insurance policies provided as a part of a plan of

reorganization gives a second chance for even late claimants to recover where, nevertheless,

some have chosen not to take part in the settlement in order to retain rights to sue certain other

parties, and where the entire reorganization hinges on the debtor being free from indirect claims

such as suits against parties who would have indemnity or contribution claims against the debtor,

we do not construe § 524(e) so that it limits the equitable power of the bankruptcy court to enjoin

the questioned suits.").  By contrast, in this case, there was no acceptance of the Plan by the

impacted class, the class of Donor claims.[10]  Accordingly, the Court cannot find that this factor

weighs in favor of approving the Release Provisions.

> 5.   *Whether the Plan Provides a Mechanism to Pay for All, or Substantially All, of the Class or Classes Affected by the Injunction.*

This factor, again, was important in *A.H. Robins*.  There, the Fourth Circuit approved a

settlement known as the *Breland* settlement.  *In re A.H. Robins Co.*, 880 F.2d at 700.  Under the

settlement, there were two classes of claims – the mandatory, non-opt out class of claims, known

as Class A (which were timely filed claims), and the Class B claims, which were non-timely filed

claims, and which were allowed to opt-out of the Plan.  *Id.*  Of the approximately 110,000 Class

B claims, only 2,960 (less than 3%) opted out.  *Id.* at 701 n.7.  Importantly, even for the opt-out

class of claims, the injunction that was approved by the Fourth Circuit allowed the opt-out Class

B claims to pursue their claims under two Outlier policies totaling $100,000,000, which were

acknowledged to be sufficient to pay the Class B claims, as well as to pursue claims against

medical providers for medical malpractice.  *Id*. at 701 ("The injunction under sections 1.85 and

8.04 of the Plan prevents these claimants from suing all third parties "*other than* 'insurer[s]'

---

[10]   The Debtor might contend that disallowed claimants are, as a matter of law, not entitled to vote, and therefore, the Donors could not possibly have accepted the Plan as a class.  11 U.S.C. § 1126(a) ("The holder of a claim or interest allowed under Section 502 of this title may accept or reject a plan").  The issue, however, is not whether the Donor claims were entitled to vote; in fact, they were not.  If one factor to be considered here was whether the impacted class accepted the Plan and voted in favor of the Release Provisions, the plain answer would be no.

(which includes Aetna) and claims based exclusively on medical malpractice."). *Id.* (emphasis added).[11]

In this case, in the words of the Second Circuit, the Donor claims have not been "channeled" anywhere; they have simply been disallowed. *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142. The Plan does not provide any mechanism for the payment of the claims affected by the Release Provisions, specifically, the Donor claims. This factor weighs heavily against approval of the Release Provisions.

> 6. *Whether the Plan Provides an Opportunity for Those Claimants who Choose not to Settle to Recover in Full.*

Finally, the Plan does not provide any opportunity for the Donors to recover. *See supra* Part I(5). In fact, the very purpose of the Release Provisions is to protect the Released Parties from any claims by the Donors, thereby precluding any recovery from third party sources outside of the Plan. This factor, too, weighs against approval of the Release Provisions.

> 7. *A Synthesis of the Foregoing Factors.*

We are, then, faced with the situation where (and the Court so finds): (a) the officers and directors are potentially exposed to substantial liabilities, for which they will be entitled to assert claims for indemnification against the Debtor for any damages that might be awarded to the Donors, and the advancement of legal fees, thereby putting the feasibility of the reorganization potentially at risk; (b) it is unlikely that the officers and directors will leave *en masse*, solely because of the assertion of Donor claims; (c) the officers and directors are not contributing anything financially toward the reorganization; (d) there is no support from the affected Donor

---

[11]   At the confirmation hearing in this case, the Debtor relied on a statement in *A.H. Robins*, to the effect that the Donors should not be allowed to "sit on the sidelines," and then seek recovery from the officers and directors. Tr. I, p. 110. But in *A.H. Robins*, the release provisions were approved precisely because the opt-out claimants had alternative means of recovering in full on their claims. 880 F.2d at 701 ("And, in all events, provision for payment in full of all class B claimants has been made").

class of disallowed claims; (e) there is no mechanism within the Plan for the Donors to be paid

anything; and (f) there is no ability for the Donors to recover anything outside of the Plan if the

Plan Release Provisions remain in place.  The single factor in favor of the Release provisions –

the potential for an obligation to indemnify the officers and directors – cannot by itself justify the

Release Provisions.  If it did, then third party releases would be the norm, not the exception, in

Chapter 11 cases.  This would contravene the now-universally accepted proposition that third

party releases are to be granted only in exceptional cases.  *See in re Wash. Mut., Inc.,* 442 B.R.

314, 349 (Bankr. D. Del. 2011) (holding that an identity of interests arising out of indemnity

obligations "alone is insufficient to justify the releases.  To hold otherwise would eliminate the

other four factors and would justify releases of directors and officers in every bankruptcy case.

That is not the law.").

The Court concludes that, on balance, the Release Provisions are not justified under the

circumstances of this case.

**II.      The Exculpation Provisions (Section 7.21).**

Section 7.21 provides for exculpation for the Released Parties (defined in Section 7.19)

for any acts or omissions in connection with the bankruptcy case, the Disclosure Statement, or

the Plan of Reorganization.  This provision is less offensive than the Release Provisions of

Section 7.19 of the Plan.  Judge Mitchell approved the Exculpation Provisions at the

confirmation hearing, stating:

> I don't think the exculpation provision goes really beyond the protection that a
> Chapter 7 trustee or Chapter 11 trustee would have.  Under the *Barton* Rule
> [*Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672 (1881)], you can't bring a suit
> against a trustee for matters connected with the administration of the estate
> without getting the permission of the court that appointed the trustee. . . . So, I
> don't believe it is at all unreasonable to effectively make this court the gatekeeper

24

as to whether suits can be brought against parties for carrying out the duties that
would be imposed on a trustee had a trustee been appointed in this case.

Tr. II, pp. 14-15.[12]

The Fourth Circuit recently re-visited the *Barton* doctrine in *McDaniel v. Blust*, 668 F.3d

153(4th Cir. 2012).  In *McDaniel*, the Court affirmed the dismissal of claims against a Chapter 7

trustee's counsel under the *Barton* doctrine, which requires leave of court before a receiver or a

bankruptcy trustee (and now, it is clear, his or her professionals) can be sued.  *Id.*  The Court

affirmed the dismissal of claims against the trustee's counsel, holding that the allegations made

by the plaintiffs "can be considered by the bankruptcy court . . . in its role as gatekeeper."  *Id*. at

157.  *McDaniel*, while not directly on point here, lends support to Judge Mitchell's approval of

the Exculpation Provisions from the standpoint of the Bankruptcy Court as gatekeeper.  *See also

in re Vistacare Group, LLC*, 678 F.3d 218 (3d Cir. 2012) (confirming the continued validity of

the *Barton* doctrine).

Exculpation provisions of this kind find their genesis in Section 1103(c) of the

Bankruptcy Code, at least insofar as Committee members are concerned.  They generally are

permissible, so long as they are properly limited and not overly broad.  *In re PWS Holding

Corp.,* 228 F.3d 224, 246 (3d Cir. 2000) (finding exculpation provisions to be consistent with

Bankruptcy Code Section 1103(c), for Committee members); *In re South Edge LLC*, No. 2:11–

CV–01963–PMP–PAL, 2012 WL 3262880, at *10 (D. Nev. Aug. 8, 2012) ("[T]he exculpation

provision in section 8.10 when properly interpreted is within the bankruptcy court's power

because the bankruptcy court has exclusive jurisdiction over the parties and their conduct in the

bankruptcy proceedings.  Section 8.10 sets a standard of care to be applied in the bankruptcy

---

[12]   The Behrmanns have already sued Committee Counsel in federal court.  *Behrmann v. McGuire Woods*, Case
No. 1:11cv419 (E.D. Va. 2011).

proceeding—a matter which lies within the bankruptcy court's exclusive jurisdiction—and reiterates federal preemption principles."); *In re Wash. Mut., Inc*., 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (holding that "[t]he exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers"); *In re Quincy Med. Ctr., Inc.*, No. 11-16394-MSH, 2011 WL 5592907 (Bankr. D. Mass. Nov. 16, 2011); *In re Yellowstone Mt. Club, LLC*, 460 B.R. 254 (Bankr. D. Mont. 2011); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 261 (Bankr. M.D. Fla. 2006); *In re WCI Cable, Inc.,* 282 B.R. 457 (Bankr. D. Or. 2002).

In this case, the Exculpation Provision prevents suits against the Released Parties, who are defined in Section 7.19 as "the Debtor, Reorganized Debtor, the Committee, the members of the Committee and their designated representatives in their capacity as such, any of such parties' respective current (i.e., as of the Confirmation Date) officers, directors or employees, and any of such parties' successors and assigns."  Debtor's Fourth Am. Plan, §§ 7.19, 7.21.  The class of Released Parties, as approved by the Court, was considerably narrowed from the definition of Released Parties originally set forth in Section 7.19 of the Debtor's Fourth Amended Plan. Notably, the estate's professionals were removed from the definition of Released Parties in response to the United States Trustee's Objections.  *See* Tr. I, p. 108 (Mr. LeForce: "[W]e are willing to remove the professionals").[13]

---

[13]  The Released Parties originally were defined as follows: "the Debtor, Reorganized Debtor, the Committee, the members of the Committee in their capacity as such, any of such parties' respective current (i.e., as of the Confirmation Date) members, officers, directors, advisors, attorneys, affiliates, representatives, agents, financial advisors, employees or investment bankers, and any of such parties' successors and assigns." Fourth Am. Plan, § 7.19.  The Confirmation Order, in narrowing the scope of the Release, Exculpation and Injunction Provisions, *deleted* the following parties from the definition of Released Parties: "*advisors, attorneys, affiliates, representatives, agents, financial advisors… or investment bankers.*"  (Emphasis added).  The Confirmation Order *added* the words "*and their designated representatives,*" after the words "the members of the Committee."  Docket No. 687, p. 27 (emphasis added).

The Exculpation Provision is limited to acts or omissions taken in connection the bankruptcy case itself.  It does not purport to release any pre-petition claims against the officers or directors.  Further, as Judge Mitchell noted, there is a "gatekeeper" function built into Section 7.21, in that Section 7.21 expressly allows for suits against the Released Parties if the claimant "obtains the prior approval of the Bankruptcy Court to bring such a claim."  Order Confirming Fourth Am. Plan of Reorganization, Docket No. 687, p.28.

The Court finds that the Exculpation Provision of Section 7.21: (a) is narrowly tailored to meet the needs of the bankruptcy estate; (b) is limited to parties who have performed necessary and valuable duties in connection with the case (excluding estate professionals); (c) is limited to acts and omissions taken in connection with the bankruptcy case; (d) does not purport to release any pre-petition claims; and (e) contains a gatekeeper function by which the Court may, in its discretion, permit an action to go forward against the exculpated parties.  The Court will not disturb the Exculpation Provisions of Section 7.21.

### III.     The Injunction Provisions (Section 7.20).

The Injunction Provisions of Section 7.20 give effect to both the Release Provisions of Section 7.19 and the Exculpation Provisions of Section 7.21.  For the reasons stated in Parts I and II above, the Court will approve the Injunction Provisions insofar as they enforce the Section 7.21 Exculpation Provisions.  The Court will not enforce the Injunction Provisions to the extent that they give effect to the Release Provisions of Section 7.19 of the Plan.

### Conclusion

The Court finds that the record in this case does not support the Release Provisions of Section 7.19.  The Court finds that the record in the case does support the Exculpation Provisions of Section 7.21.  Finally, the Court finds that the record supports the Injunction Provisions of

Section 7.20, insofar as they purport to enforce the Exculpation Provisions of Section 7.21, but

not as they relate to the Release Provisions of Section 7.19.  An appropriate Order will issue.

Date: _____

_____
Brian F. Kenney
United States Bankruptcy Judge

Copies to:

Alan Michael Noskow, Esquire
Patton Boggs LLP
8484 Westpark Drive
9th Floor
McLean, VA 22102-3596
Counsel for National Heritage Foundation

Bruce W. Henry, Esquire
Henry & O'Donnell, P.C.
300 N. Washington Street, Suite 204
Alexandria, VA 22314
Counsel for National Heritage Foundation

Erika L. Morabito, Esquire
Foley & Lardner
3000 K Street, NW Suite 600
Washington, DC 20007
Counsel for National Heritage Foundation

William C. Crenshaw, Esquire
Akerman Senterfitt
750 9th Street NW
Suite 750
Washington, DC 20001
Counsel for National Heritage Foundation

Janet Ridgely
6201 Leesburg Pike, Suite 405
Falls Church, VA 22044
Debtor Designee

Joseph A. Guzinski, Esquire
Office of the United States Trustee
115 South Union Street, Room 210
Alexandria, VA 22314

James M. Lewis, Esquire
Rees Broome, P.C.
8133 Leesburg Pike, 9th floor
Vienna, VA 22182
Counsel for Philadelphia Indemnity Insurance Company

David Swan, Esquire
McGuire Woods LLP
1750 Tysons Boulevard, Suite 1800
McLean, VA 22102-4215
Counsel to the Official Committee of Unsecured Creditors

Glenn W. Merrick, Esquire
G.W. Merrick & Associates, LLC
5445 DTC Parkway, Suite 912
Greenwood Village, CO 80111
Counsel for John Berhmann, Nancy Behrmann, Highbourne Foundation,
Dodie Anderson, and the Dodie Anderson Foundation

Gregory H. Counts, Esquire
Tyler, Bartl, Ramsdell & Counts, P.L.C.
300 N. Washington Street, Suite 202
Alexandria, VA 22314
Counsel for John Berhmann, Nancy Behrmann, Highbourne Foundation,
Dodie Anderson, and the Dodie Anderson Foundation