UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **NATIONAL HERITAGE** | ) | **Case No. 09-10525-BFK** |
| **FOUNDATION, INC.** | ) | **Chapter 11** |
| | ) | |
| Debtor | ) | |

**OPINION AND ORDER ADJUDGING JOHN AND NANCY BEHRMANN;
JONATHAN D. MILLER; NYE, PEABODY, STIRLING, HALE & MILLER, LLP;
DANIEL J. SCHENDZIELOS; AND SCHENDZIELOS & ASSOCIATES, LLC,
TO BE IN CONTEMPT OF COURT**

This matter is the follow-up to the Court's decision in *In re National Heritage Foundation, Inc.,* 478 B.R. 216 (Bankr. E.D. Va. 2012), *aff'd sub nom National Heritage Foundation Inc. v. Behrmann*, No. 1:12-CV-1329, 2013 WL 1390822 (E.D. Va. 2013). In that decision, the Court, on remand from the Fourth Circuit, excised the Release provisions from the Debtor's confirmed Plan of Reorganization, but held the Exculpation provisions to be enforceable. The matter now comes before the Court on the Debtor's Motion for Contempt and Sanctions against John and Nancy Behrmann (Docket No. 1043) and the Behrmanns' Opposition to that Motion (Docket No. 1054). The Court initially held a hearing on the Debtor's Motion on December 4, 2012. On December 20, 2012, the Court entered an Order to Show Cause as to why John and Nancy Behrmann, and their counsel, Jonathan D. Miller, Nye, Peabody, Stirling, Hale & Miller, LLP, Daniel J. Schendzielos, and Schendzielos & Associates, LLC (collectively, "the Respondents") should not be held in contempt of Court. Docket No. 1071. The Court held an evidentiary hearing on May 1 and 2, 2013, at which all of the Respondents were present and were represented by counsel.

1

## Findings of Fact

Having heard the evidence and the testimony of the witnesses, the Court makes the

following findings of fact:

      A.   *Confirmation of the Debtor's Plan and the Fourth Circuit's Remand of the Case to this Court.*

1.      On January 24, 2009, National Heritage Foundation (hereinafter, "the Debtor" or

"NHF"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this Court.

Docket No. 1.

2.      On May 26, 2009, the Behrmanns caused to be filed a Proof of Claim in the name

of the Highbourne Foundation, in the amount of $626,332.50.  Claim No. 142-1.  The Proof of

Claim stated: "Custodial account held by NHF."  The Debtor objected to this claim on August 2,

2009.  Docket No. 341.  The Highbourne Foundation amended its claim on September 5, 2009,

as claim number 142-2.  The Amended Claim changed the amount slightly, to $643,396.05, and

stated as the basis of the claim: "Rescission of Donations."  Claim No. 142-2.  The Debtor

objected to the Amended Highbourne Foundation Claim on December 22, 2009.  Docket No.

811.  On June 29, 2010, John and Nancy Behrmann filed a pleading withdrawing Claim No. 142.

Docket No. 948.

3.      On October 16, 2009, this Court entered an Order confirming the Debtor's Fourth

Amended and Restated Plan of Reorganization (the "Confirmation Order").  Docket No. 687.

4.      Section 7.18 of the Fourth Amended Plan provided as follows:

> **Discharge of Debtor**.  All consideration distributed under this Plan will be in
> exchange for, and in complete satisfaction, settlement, discharge, and release of,
> all Claims against the Debtor of any nature whatsoever or against the Debtor's
> assets or properties, except as otherwise provided by the Plan.  Except as
> otherwise expressly provided in this Plan, entry of the Confirmation Order acts as
> a discharge of all Claims against, liens on, and interests in the Debtor, the
> Debtor's assets and properties, arising at any time before the Effective Date,

regardless of whether a proof of Claim or proof of interest was filed, whether the Claim or interest is Allowed, or whether the holder of the Claim votes to accept this Plan or is entitled to receive a Distribution under this Plan.  Upon the entry of the Confirmation Order, any holder of the discharged Claim or interest will be precluded from asserting against the Debtor or Reorganized Debtor or any of its assets or properties any other or further claim or interest based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Effective Date.  The Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtor, and Reorganized Debtor will not be liable for any Claims or interests and will only have the obligations as are specifically provided for in this Plan.

Docket No. 665, § 7.18.

5.      The Confirmation Order incorporated Section 7.18 of the Plan as though set out in its entirety in the Order.  Docket No. 687, p.19, ¶ 7.

6.      The confirmed Plan also contained certain Release, Exculpation and Injunction provisions, at Plan Sections 7.19, 7.20 and 7.21, as follows:

7.19   **Release**.        On the Effective Date, the Debtor, Reorganized Debtor, the Committee, the members of the Committee and their designated representatives in their capacity as such, any of such parties' respective current (i.e., as of the Confirmation Date) officers, directors or employees, and any of such parties' successors and assigns (the "Released Parties") shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to any party in interest who has filed a claim or who was given notice of the Debtor's Bankruptcy Case (the "Releasing Parties") for any act or omission before or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the operation of the Debtor's business, except to the extent relating to the Debtor's failure to comply with its obligations under the Plan.
Notwithstanding the foregoing, nothing contained herein shall be deemed to be a release by the Debtor or Reorganized Debtor of any of the Causes of Action retained by the Debtor pursuant to the Plan including, without limitation, the Causes of Action described on Exhibit C to the Disclosure Statement.

7.20   **Injunction**.    The satisfaction, releases, and discharge pursuant to Article VII of this Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any claim or cause of action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

3

Except as provided in this Plan or as expressly approved by the Reorganized Debtor, the Releasing Parties (as defined in Section 7.19) shall be precluded and enjoined from asserting against the Reorganized Debtor, the Estate or the Reorganized Debtor's Assets, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

7.21    **Exculpation**.  The Released Parties shall have no liability to any of the Releasing Parties (as defined in Section 7.19) for any act taken or omission made in connection with, or arising out of, the Bankruptcy Case, the Disclosure Statement, this Plan or the formulation, negotiation, preparation, dissemination, implementation or the administration of this Plan, any instrument or agreement created or entered into in connection with this Plan, any other act taken or omitted to be taken in connection with, or in contemplation of, any of the restructuring or other transactions contemplated by this Plan, and the property to be distributed or otherwise transferred under this Plan; unless such person obtains the prior approval of the Bankruptcy Court to bring such a claim. Nothing in this Section 7.21 or elsewhere in this Plan shall release, discharge or exculpate any non-Debtor party from (a) any claim owed to the United States government or its agencies, including any liability arising under the Internal Revenue Code or criminal laws of the United States, or (b) any claim of any Claimant except as expressly set forth herein.

Docket No. 687, p.19, ¶¶ 8 & 29.

7.      The Behrmanns appealed the Order confirming the Debtor's Plan, on the ground that the Release, Exculpation and Injunction provisions were improper and should not have been approved.[1]  Docket No. 709.

8.      On December 9, 2011, the U.S. Court of Appeals for the Fourth Circuit issued its Opinion, remanding the case to this Court for consideration of whether the record supported the Release, Exculpation and Injunction provisions.  Docket Nos. 986 & 989.

9.      This Court held a status conference on remand on March 6, 2012.  At the status conference, the Court had the following exchange with Mr. Merrick, counsel for the Behrmanns:

MR. MERRICK: . . . In light of the fact that there has not been an evidentiary basis or finding justifying the paragraphs which are at issue in the reorganization plan which are

---

[1]   The inclusion of the Discharge provisions of the Confirmation Order and the Plan, Section 7.18, was not appealed.

paragraphs 7.19, 7.20 and 7.21, we would ask the court to vacate at least in respect of
those provisions until such time as the court considers whether they should be in there.

In support of that, I would mention to the court that the plan itself does have a
severability provision.  That is found at Section 12.2 of the plan of reorganization, and
in that provision the plan proponent expressly provides that if the court finds that any of
the provisions are unlawful the court is to strike the unlawful provisions and the
balance of the plan is to remain as the confirmed plan.

We are not asking that the plan confirmation process be set aside.  What we're
asking is the court to excise paragraph 7.19 through 7.21 inclusive and –

THE COURT: Well, what would that mean, that your clients would run off to state court
and sue the individuals?

MR. MERRICK: Well, Judge, we need to have –

THE COURT: It seems to me that if that's the case, that it could create some headaches
on all sides, if your –

MR. MERRICK: I don't –

THE COURT: Just let me finish, please. If your clients run off to state court and sue the
individuals, it's obviously going to cost the individuals some money to defend those
cases.  But if at the end of the day the court sustains the release provisions, then it seems
like you have wasted your time and money, as well.

So there are practical problems to doing that while we're in this admittedly gray
area of a remand and a determination of whether the release provisions should be
included or not.

Isn't that the ultimate question, whether these release provisions get excised or
not?

MR. MERRICK: We believe that it is, Your Honor.

THE COURT: Okay. So what's your answer to the question, are you going to run off to
state court and sue these individuals?

MR. MERRICK: It's not our intent to run off between now and April 10th to go sue these
individuals.

However, I was just making a point that conceptually, in light of the 4th Circuit's
Opinion, I don't think that those provisions should be operative.

But *in response to the court's direct question, no, there is no plan or intent to go
file an action against the debtor's principals prior to this court ruling.  That's the direct
answer to your question.*

THE COURT: Thank you. I appreciate that.

Docket No. 1047, Tr. Mar. 6, 2012, pp. 14-17 (emphasis added).

10.     Although Mr. Merrick's representation initially was limited to "between now and April 10th," he expanded on that to represent that the Behrmanns would not file an action against the Debtor's principals "prior to this court ruling" on the validity of the Release, Exculpation and Injunction provisions.  *Id.*  The Court accepted the latter representation as an acceptable resolution of the matter.

11.     According to Mr. Merrick, he immediately reported this exchange with the Court to Mr. Behrmann, Mr. Schendzielos and Mr. Miller.  Docket No. 1064.

B.     *The Filing of the Complaint in California.*

12.     On June 28, 2012—before the Court issued its Memorandum Opinion and Order of August 27, 2012, discussed below—the Behrmanns filed a Complaint for Damages against the Debtor and the Debtor's Officers and Directors in the U.S. District Court for the Central District of California (the "Complaint").  Case No. CV12-5636-DMG.  The Complaint was filed by Mr. Miller of the law firm of Nye, Peabody, Stirling, Hale & Miller, LLP, and Mr. Schendzielos of Schendzielos & Associates, LLC.  NHF Motion for Contempt, Docket No. 1043, Ex. 2.

13.     The Complaint was filed by the Behrmanns in their own capacity, and as Assignees of the following claimants: (a) Dr. Robert Griego and Dr. Carole Griego; (b) John Goodson; (c) Terry P. Gillett and Brenda A. Gillett (collectively, "the Assignors").  NHF Motion for Contempt, Docket No. 1043, Ex. 2.[2]

14.     The Complaint names the Debtor as a Defendant.  *Id.*

---

[2]  The Assignors do not appear to have filed claims with the Court, unless they were filed under a Foundation name unknown to the Court.  The Complaint alleges that the Assignors "were not given notice of the bankruptcy filing and not given the opportunity to submit their claims to the bankruptcy court."  Complaint, ¶ 58.  This allegation appears to have been deleted from the Amended Complaint, discussed below.  In any event, the Behrmanns clearly were on notice of the filing of the bankruptcy case at the time the Complaint was filed.

15.    The Complaint also names the following individuals who are or were officers and/or directors of the Debtor:  John T. Houk, II; Miriam M. Houk; John T. Houk, III; Janet H. Ridgely; and Julie L. Houk (collectively, the "Officers and Directors").  *Id.*

16.    The Complaint contains "Class Action Allegations," beginning at paragraph 22. The proposed Class is defined as: "The Plaintiffs . . . and all others similarly situated persons who were affected by the confiscation of money placed in donor advised funds ('DAF' ) with NHF despite repeated assurances that the funds were under the plaintiffs' control."  Complaint, ¶ 22.  The putative class would have included virtually all of the Donors in connection with the NHF bankruptcy case.  This class would have included the Donors who filed Proofs of Claim and whose Proofs of Claim were disallowed by this Court, as well as those who could have filed Proofs of Claim but did not, all of whom are nonetheless bound by the terms of the confirmed Plan.

17.    The Class is described as consisting of "over a thousand residents of California and several thousands of persons throughout the United States."  Complaint, ¶ 22.

18.    The Complaint includes allegations both of pre-petition misconduct and misrepresentations (Complaint, ¶¶ 36-44),[3] as well as allegations of post-petition, but pre-confirmation, misconduct (Complaint, ¶¶ 53-61).[4]

---

[3]  *See, e.g.*, Complaint, ¶¶ 41 ("In the period between approximately January of 1997 and December of 2007"), 42 ("at the inception of the relationship with NHF (in approximately January of 1997)"), 49 ("between the inception of their accounts and January of 2009"), and 50 ("at the inception of the relationship with NHF Houk advised, counseled and encouraged the Plaintiffs").

[4]  This Section of the Complaint (¶¶ 53-61) is styled: "The NHF Bankruptcy Filing and Proceedings."  The gravamen of this Section of the Complaint is that: "During the course of NHF's bankruptcy proceedings, NHF confiscated and liquidated all of the funds and property then contained in Highbourne and other plaintiffs' DAFs at NHF."  Complaint, ¶ 55.

C. *The Court's August 27, 2012, Memorandum Opinion and Order, the Stay Pending Appeal and the Filing of the Amended Complaint.*

19.    On August 27, 2012, this Court entered its Memorandum Opinion and Order,

holding: (a) the non-debtor Release provisions of the Plan were unenforceable; (b) the

Exculpation provisions were enforceable and would not be disturbed; and (c) the Injunction

provisions were unenforceable as to the Release provisions, but continued to be enforceable as to

the Exculpation provisions.  Docket Nos. 1015-1016.

20.    On September 11, 2012, the Debtor filed a Motion to Stay the August 27th Order,

pending appeal.  Docket No. 1023.  The Court granted a stay pending appeal on October 25,

2012.  Docket No. 1039.

21.    On October 19, 2012, the Behrmanns filed an Amended Complaint in the

California Action (the "Amended Complaint").  Debtor's Motion, Ex. 3.  The Amended

Complaint drops Mr. Goodson as an Assignor, but adds William P. O'Connell and Jinan

O'Connell as Assignors.[5]

22.    On October 22, 2012 (four months after the original Complaint was filed, and

three days after the Amended Complaint was filed), the Behrmanns filed a Motion for Leave to

file their Complaint in California pursuant to the Exculpation provisions of the Plan.  Docket No.

1035.  They noticed that Motion for a hearing with the Court on December 4, 2012.  Docket No.

1036.  This was the first time that NHF and its counsel were notified of the filing of the litigation

in California.

---

[5]   Again, the O'Connells do not appear to have filed a Proof of Claim with this Court, unless they filed it under a
Foundation name unknown to the Court.

23.    The Amended Complaint adds a number of Defendants, but still includes NHF, as well as the Debtor's Officers and Directors, as Defendants.  It does not seek the certification of a class, as did the original Complaint.

24.    With respect to the Counts against NHF, the Amended Complaint includes the following language:

> The Behrmann Plaintiffs, in their individual capacities, are not bringing this claim against NHF for conduct that pre-dates July 1, 2010. None of the Plaintiffs are bringing this claim against NHF or the Houk Defendants for the period of January 24, 2009 through October 16, 2009 (the reorganization period), until the bankruptcy court, this Court, or a competent Court of Appeals, authorizes such action, at which point, this claim shall be deemed pursued.

Amended Complaint, ¶¶ 49, 186, 216, 223, 232, 239.

25.    The Court interprets the reference in the first sentence quoted above to the "Behrmann Plaintiffs, *in their individual capacities*" (emphasis added), to mean that the Plaintiffs, as Assignees, are in fact bringing claims against NHF for conduct that pre-dates July 1, 2010.[6]

26.    With respect to claims that are brought against the Officers and Directors, the first sentence quoted above ("The Behrmann Plaintiffs, in their individual capacities, are not bringing this claim against NHF for conduct that pre-dates July 1, 2010") is deleted, but the balance of the above-quoted disclaiming language is re-stated.  Amended Complaint, ¶¶ 194, 202.

27.    Despite the disclaimer language as to NHF, the Amended Complaint is replete with allegations that pre-date July 1, 2010, and that pre-date the Confirmation Order of October 16, 2009.  *See, e.g.,* Amended Complaint, ¶¶ 1 ("This action challenges Defendants' unlawful and unethical scheme to fraudulently solicit, market, sell and issue charitable giving plans to

---

[6]    The parties reached a settlement with an effective date of July 1, 2010, in which the Behrmanns released the Debtor from any claims as of that date.  This is the reason the Amended Complaint refers to July 1, 2010.

individuals"), 2 ("Specifically, on January 24, 2009, Defendants first informed individual

investors . . ."), 3 ("Just six months before the January 24th [2009] disclosure . . ."), 70 ("in

1995, Defendants founded the National Heritage Foundation"), 74 ("Between the period of 1995

and 2009 . . ."), 77 ("Specifically, on or about December 28, 1996 . . ."), 78 ("On or about May

24, 1997 . . ."), 79 ("Conferences began as early as June 24, 1997"), 80 ("In 1999 and again in

2006 . . ."), 84 ("as early as December 28, 1996 . . ."), 85 ("On April 12, 1997 . . ."), 86-90

(allegations of an IRS investigation in 1998), 96 ("in the late 1990's . . ."), 136 ("on January 24,

2009 . . ."), 141 ("On or about January 26, 2009 . . ."), 142 ("on or about February 19, 2009 . .

."), 144 ("As of February 20, 2009 . . ."), 151 ("From its inception . . ."), 152 ("In an internal

NHF Board meeting on December 28, 2000 . . ."), 154 ("just two days before NHF declared

Chapter 11 bankruptcy . . ."), 159 ("Beginning in 1996 . . ."), 164 ("In the period between

approximately January of 1997 and December of 2007 . . ."), 165 ("at the inception of the

relationship with NHF . . ."), 167 ("From the inception of their fund . . ."), 177 ("In the period

between the inception of their accounts and January of 2009 . . ."), & 178 ("at the inception of

the relationship . . .").[7]

  28. The Court finds that the Amended Complaint is an attempt to collect on a pre-

petition and pre-confirmation debt against the Debtor.  There are no allegations in the Amended

Complaint that the Behrmanns or their Assignors were harmed by the Debtor, post-confirmation,

at all.  The Behrmanns and the Assignors parted with their funds before the NHF bankruptcy

case was ever filed.  All of the "Specific Facts Involving Mail & Wire Fraud" are alleged to have

occurred pre-petition.  *See* Amended Complaint, ¶¶ 83-134.

---

[7]   These are just a handful of examples of allegations in the Amended Complaint that pre-date the Settlement
Agreement of July 1, 2010, and that pre-date the Confirmation Order of October 16, 2009.  To identify all instances
of these allegations would be to restate much of the 87 page Amended Complaint.

29.    All of the allegations of "Specific Facts Involving Bankruptcy Fraud" occurred during the course of the bankruptcy case and before the Plan was confirmed.  *Id.* at ¶¶ 135-150. All of these allegations constitute an attempt to state claims that are Exculpated claims under Section 7.21 of the confirmed Plan, as amended.  To date, the Behrmanns have not received the permission of this Court to pursue any of the Exculpated claims.

30.    The only allegations of post-confirmation conduct in the Amended Complaint are contained in paragraphs 9 ("In 2011 . . ."), 156 ("on September 29, 2010 . . ."), 157 ("On November 30, 2010 . . .") and 158 ("on December 13, 2010 . . .").  However, the entirety of the claimed harm to the Behrmanns is alleged to have occurred well before the bankruptcy filing, or during the course of the bankruptcy case (where, it must be remembered, they ultimately withdrew their claim).  *See* Amended Complaint, at 60 ("*How the NHF Enterprise Affected Plaintiffs*") and ¶¶ 159 ("Beginning in 1996 . . ."), 164 ("In the period between approximately January of 1997 and December of 2007 . . ."), 165 ("at the inception of the relationship with NHF . . ."), 166 ("in the period between approximately January of 1997 and December of 2007 . . ."), 177 (as to the Assigned claims, "In the period between the inception of their accounts and January 2009 . . .") & 178 (as to the Assigned claims, "at the inception of the relationship . . .").

31.    Similarly, despite the disclaimer language as to the Officers and Directors, the Amended Complaint is replete with allegations of misconduct and breaches of duty during the Reorganization Period (defined as January 24, 2009, through October 16, 2009), allegations that are plainly barred under the Exculpation provision of the Plan.  *See* Amended Complaint, ¶¶ 135-150 (all under the heading "*Specific Facts Involving Bankruptcy Fraud*").

*D. The Debtor's Contempt Motion and the Show Cause Order.*

32.     On November 14, 2012, the Debtor filed a Motion for Contempt Sanctions against

the Behrmanns.  Docket No. 1043.  The Behrmanns filed an Opposition.  Docket No. 1054.

33.     The Court held a hearing on the Debtor's Motion on December 4, 2012.  On

December 20, 2012, the Court entered an Order to Show Cause why the Respondents should not

be held in contempt of Court.  Docket No. 1071 (the "Show Cause Order").  Specifically, the

Show Cause Order required the Respondents to show cause, if any, why they should not be held

in contempt because it appeared *prima facie* that the Respondents:

> A. Filed the Complaint against the Officers and Directors in contravention of counsel for
> the Behrmanns' express representations to the Court at the March 6, 2012, hearing
> that they would not file a Complaint until after the Court ruled on the effectiveness of
> the Release and Exculpation provisions;
>
> B. Filed the Amended Complaint, which included Exculpated Claims against the
> Officers and Directors, without this Court's prior permission, after the Court's
> Memorandum Opinion and Order of August 27, 2012, reinstated the Exculpation
> provisions of the confirmed Plan;
>
> C. Filed the Complaint against the Debtor, National Heritage Foundation, in violation of
> Section 7.18 of the Confirmed Plan of Reorganization, Paragraph 7 of the
> Confirmation Order, and in violation of 11 U.S.C. § 1141(d)(1); and
>
> D. Filed the Amended Complaint against the Debtor, National Heritage Foundation, in
> violation of Section 7.18 of the Confirmed Plan of Reorganization, Paragraph 7 of the
> Confirmation Order, and in violation of 11 U.S.C. § 1141(d)(1).

Show Cause Order, Docket No. 1071, ¶ 40(A)-(D).

*E. The District Court's Decision.*

34.     On April 3, 2013, the District Court entered a Memorandum Opinion and Order

affirming this Court's decision of August 27, 2012.  *National Heritage Found., Inc. v.*

*Behrmann*, 1:12-cv-1329 (AJT/JFA), Docket Nos. 25 & 27.

12

*F. The Hearing on the Show Cause Order.*

35.    The Court held a hearing on the Show Cause Order on May 1 and 2, 2013.  The

following witnesses testified at the hearing, and the Court makes the following findings of fact

based on their testimony:

<u>Mr. Miller</u>: Mr. Miller is a partner with the Nye Peabody law firm.  He has been

practicing law for 11 years.  His practice consists of intellectual property law, litigation and the

defense of public entities.  He is licensed in California.  He has served as an adjunct professor of

law.  Other than this case, he has no experience in bankruptcy law.

Mr. Miller began representing the Behrmanns in late November 2011, as local counsel in

a case against the Behrmanns' insurance broker, Mr. Baker.  In February and March of 2012, he

became lead counsel in the case, and began to spend 12 to 15 hours a day on the case.  The case

was scheduled to begin a six and one half to eight week trial, beginning in March 2012.  On

April 10, 2012, the court granted a non-suit in favor of the Defendants, dismissing the case on

the merits.  The decision is on appeal.

Mr. Miller was not present in Court on March 6, 2012.  He was not representing the

Behrmanns in this matter, at the time.  He testified that he did receive the March 6th e-mail from

Mr. Merrick, but he didn't see it, or he saw it and forgot about it.  The Court accepts this

testimony.

The Behrmanns engaged Mr. Miller in this matter in May 2012, to investigate possible

claims against third parties and to determine which statutes of limitations were applicable and

were about to run (if any).  He concluded that any negligent misrepresentation claims against

third parties would run at the end of June 2012.  He was aware of the Confirmation Order.  He

also testified that he was of the understanding that the Fourth Circuit had "vacated" the

Confirmation Order, and that because of this, the statutes of limitations could be running as against third parties.

Mr. Miller filed the Complaint on June 28, 2012.  He filed the Amended Complaint on October 22, 2012.  Prior to filing the Amended Complaint, he met with the Assignors in Arizona. The Assignors represented to him that they did not have notice of the filing of the NHF bankruptcy case.

The Amended Complaint was served on NHF on October 24, 2012, the day before this Court granted the Stay Pending Appeal.  Respondents' Ex. KK.  Mr. Miller stopped further service of the Amended Complaint when he learned of this Court's Order granting a Stay Pending Appeal.

After NHF's counsel learned of the filing of the Amended Complaint, the parties had a telephone conversation on November 6, 2012.  NHF's counsel demanded that the lawsuit be dismissed.  Mr. Miller and Mr. Schendzielos refused.  The parties then exchanged a series of e-mails, concerning a possible stay of the lawsuit.  Respondents' Exs. D, E, F, J-O, Q-Z.  At the end of the day, the parties: (a) agreed to a stay as to the Officers and Directors (Respondents' Ex. EE); but (b) were unable to agree to a stay as to NHF (Respondents' Ex. F, pp. 3-4).  This latter result was attributable in part to the fact that NHF's counsel wanted to retain the ability to file and pursue Motions for sanctions and to dismiss the case under Rules 11 and 12, notwithstanding the stay.  The inability of the parties to agree on a stay as to NHF also was attributable to the fact that Mr. Miller and Mr. Schendzielos took the position that NHF's counsel, Foley & Lardner, had a conflict of interest.  As a result, Mr. Miller and Mr. Schendzielos refused to discuss a stay as to NHF with Foley & Lardner.  Respondents' Ex. F & I.

14

On February 6, 2013, District Judge Gee stayed the action as to all parties.  Respondents'

Ex. C (Case No. 2:12-cv-05636-DMG-CW, Docket No. 99).

Mr. Schendzielos.  Mr. Schendzielos is a member of the Colorado State Bar and has been

practicing law for 20 years.  He is also admitted in the State of Arizona, as well as in the federal

courts in Wisconsin.  He has been actively involved in the Colorado State Bar, including service

on the State Bar's Grievance Policy Committee, of which he was the Chair.  Unlike Mr. Miller,

Mr. Schendzielos has had some experience in bankruptcy law, representing consumer debtors,

creditors in three Chapter 11 cases and one Chapter 11 Debtor.

Mr. Schendzielos largely confirmed Mr. Miller's testimony.  He acted as co-counsel with

Mr. Miller in the Baker matter in California.  During the January-April time frame of 2012, the

Baker case consumed roughly 95% of his time.  Like Mr. Miller, he acknowledged having

received Mr. Merrick's March 6th e-mail, but testified that he either didn't read it or he forgot

about it.  The Court accepts this testimony.

Mr. Schendzielos also met with the Arizona Assignors, before filing the federal lawsuit.

He testified that the Arizona Assignors were adamant that they did not receive notice of the NHF

bankruptcy filing.  Mr. Schendzielos was aware of the Confirmation Order before he filed the

Complaint.  He testified that he believed that he was able to file the Complaint because the

Fourth Circuit had "vacated" the Confirmation Order.  He admitted, though, that the filing of the

Complaint was a violation of the Confirmation Order.

Mr. Merrick.  Mr. Merrick has represented the Behrmanns at all times relevant to this

hearing.  He did not sign the Complaint, nor the Amended Complaint.  He is, therefore, not a

Respondent.

Mr. Merrick is a member of the Colorado State Bar.  He was present at the March 6th

hearing.  He sent the March 6th e-mail to Mr. Miller and Mr. Schendzielos, which described the

results of the hearing before this Court.  He conceded that the above quotation of his

representation to the Court on March 6, 2012, is accurate.  He testified that he represented to the

Court that the Behrmanns had no present intent to run out and file a lawsuit, but that "things

changed," or words to that effect.  Once Mr. Miller and Mr. Schenzelios got involved and

determined that statutes of limitations on certain claims were about to run, he testified, the

Behrmanns needed to file the Complaint in order to preserve the statutes of limitations.

Mr. Goroff.  Mr. Goroff is a litigation partner at Foley & Lardner.  At various times, he

has represented NHF in connection with this case, the appeal to the Fourth Circuit, and more

recently, the appeal to the District Court of the Court's August 27th Memorandum Opinion and

Order.  Mr. Goroff testified that Foley & Lardner charged their "floor rates" to NHF, which are

lower than rates charged in many other matters.  He testified that, overall, there were **$44,166** in

write-offs on the NHF invoices.  He also testified that Foley & Lardner gave NHF a 10%

discount on every bill it sent to NHF.  He testified that NHF has paid the bills.

Mr. Goroff acknowledged on cross examination that the firm charged **$39,151** to NHF to

defend the Behrmanns' Motion for Leave to file the Exculpated Claims, which was included in

NHF's fee request.  He also testified that his firm charged **$31,210** in connection with the

Behrmanns' Motion to dissolve the Order Granting a Stay Pending Appeal, which also was

included in NHF's fee request.  Overall, he testified that the blended rate for Foley & Lardner's

services in the matter was **$489** per hour.  He acknowledged that Foley & Lardner was

representing both NHF and the Directors and Officers, to whom NHF had an obligation to

indemnify and defend.  He was not able to quantify how the defense costs were increased by the inclusion of NHF in the lawsuit.

Ms. Nelson.  Ms. Nelson is Senior Counsel with Foley & Lardner.  She has been actively involved in the representation of NHF in this case, in the appeals, in two insurance coverage cases (in Texas and in the Eastern District of Virginia), and in connection with third party subpoenas issued to NHF in certain litigation.

Ms. Nelson testified that she and the other members of the Foley & Lardner team first became aware of the California Complaint when the Respondents filed a Motion with this Court on October 22, 2012, for leave to file the Exculpated Claims (to which a copy of the Amended Complaint was attached).  She was present during the phone call of November 6, 2012, with Mr. Miller and Mr. Schendzielos.  She testified that the Foley & Lardner attorneys demanded a dismissal of the lawsuit because, in their view, it included the discharged Debtor as a Defendant, and because it included Exculpated Claims.  She testified that Mr. Miller agreed to inform the California District Court of the Stay Pending Appeal issued by this Court.  On the same day, however, she was surprised to see that the Behrmanns filed a Motion to Reconsider the Order Granting a Stay Pending Appeal.

After quite a bit of e-mail traffic concerning a possible stay of the California litigation, and with the time to respond to the California action rapidly approaching, the Behrmanns agreed to a stay as to the Officers and Directors.  They did not agree to a stay as to NHF because, as noted above, the Respondents refused to negotiate with Foley & Lardner with respect to NHF, because of the Respondents' assertion of a conflict of interest on Foley & Lardner's part.

Finally, Ms. Nelson testified as to the Foley & Lardner invoices.  She had the unenviable task of combing through the Foley & Lardner bills and including or excluding certain items

17

within the fee statements.  She made these judgment calls after consulting with Mr. Goroff and

Ms. Morabito.  Ms. Nelson testified that she and the other Foley & Lardner attorneys erred on

the side of being conservative, i.e., excluding any billing items that were questionable, or

marginally relevant to the Contempt Motion and the California litigation.

Mr. Ackerly/ Mr. Henry.  Mr. Ackerly and Mr. Henry testified as expert witnesses on the

reasonableness of the Foley & Lardner legal fees, for the Respondents and for NHF,

respectively.  Mr. Ackerly and Mr. Henry are both known to the Court and are highly respected

bankruptcy practitioners.  They had the following differences of opinion with respect to NHF's

legal fees in this matter:

- *Relevant Market*: Mr. Ackerly defines the relevant market as the Alexandria and

  Richmond divisions of the Bankruptcy Court for the Eastern District of Virginia.  He

  based this on the fact that practitioners from Alexandria routinely appear in

  Richmond, and vice versa.  Mr. Henry testified that the relevant market is the

  Washington, D.C., metro area.  He based this conclusion on his observation that it is

  more likely that practitioners from D.C. will appear in the Alexandria Division, than

  practitioners from Richmond.

- *Allowable Hourly Rates*: Mr. Ackerly made a comparison of attorneys with Ms.

  Morabito's years of experience and Ms. Nelson's years of experience.  He found that

  Ms. Morabito's hourly rate should be $520-540 per hour, and Ms. Nelson's hourly

  rate should be $440 per hour.  *See* Respondents' Ex. HH, pp. 7-8.  Mr. Henry, on the

  other hand, testified that Ms. Morabito's hourly rate of $680-690 per hour was

  reasonable and that Ms. Nelson's hourly rate of $470-$500 per hour also was

  reasonable.  *See* NHF's Ex. 22, pp. 11-13.

The Court notes that Mr. Henry, NHF's expert on fees, never testified that the fees claimed by NHF in this matter, totaling **$766,322.96,** were reasonable.[8]

G. *Findings on Contempt.*

36.    The Court finds that the Confirmation Order and the Memorandum Opinion and Order of August 27, 2012, were valid Orders of this Court and were in favor of the Debtor.[9]

37.    The Court finds that all of the Respondents had actual notice of the entry of the Confirmation Order and the entry of this Court's Memorandum Opinion and Order of August 27, 2012.

38.    The Court finds by clear and convincing evidence that all of the Respondents have taken the following actions in violation of the Court's Confirmation Order and the Memorandum Opinion and Order of August 27, 2012:

> A. Filed the Amended Complaint, which included Exculpated Claims against the Officers and Directors, without this Court's prior permission, after the Court's Memorandum Opinion and Order of August 27, 2012, reinstated the Exculpation provisions of the confirmed Plan;
>
> B. Filed the Complaint against the Debtor, National Heritage Foundation, in violation of Section 7.18 of the Confirmed Plan of Reorganization, Paragraph 7 of the Confirmation Order, and in violation of 11 U.S.C. § 1141(d)(1); and
>
> C. Filed the Amended Complaint against the Debtor, National Heritage Foundation, in violation of Section 7.18 of the Confirmed Plan of Reorganization, Paragraph 7 of the Confirmation Order, and in violation of 11 U.S.C. § 1141(d)(1).

39.    The Court finds that, as a result of the Respondents' violations of the foregoing Orders, the Debtor has been harmed.

---

[8]    Foley & Lardner asserts that, between its 10% discount, its floor rate and its writeoffs, it would have charged NHF an additional $247,270 in legal fees.  NHF Ex. 27 at Ex. E.  These amounts, if charged, would have brought the total fees to **$1,013,593.**

[9]    More specifically, the Confirmation Order was inarguably in favor of the Debtor.  The August 27th Memorandum Opinion and Order were in favor of the Debtor, insofar as the Exculpation Provisions of the Plan are concerned.

**Conclusions of Law**

In order to be found in contempt of a Court order, the movant must show:

(1) the existence of a valid decree of which the alleged contemnor had actual or
constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the
alleged contemnor by its conduct violated the terms of the decree, and had knowledge
(at least constructive knowledge) of such violations; and (4) that the movant suffered
harm as a result.

*United States v. Under Seal (In re Grand Jury Subpoena),* 597 F.3d 189, 202 (4th Cir. 2010);

*see also Rountree v. Nunnery (In re Rountree),* 448 B.R. 389, 416–17 (Bankr. E.D. Va. 2011).

The creditor need not act with specific intent.  Rather, it is sufficient if the creditor: (a) knew of

the existence of the decree and (b) intended the actions which violated that decree.  *Cherry v.*

*Arendall (In re Cherry),* 247 B.R. 176, 187 (Bankr. E.D. Va. 2000).

The standard of proof for civil contempt is by clear and convincing evidence.  *Cromer v.*

*Kraft Foods N. Am., Inc.,* 390 F.3d 812, 821 (4th Cir. 2004).  Willfulness is not an element of

civil contempt.  *In re Gen. Motors Corp.,* 61 F.3d 256, 258 (4th Cir. 1995).

The Court also finds that there is no distinction to be made between the Behrmanns and

their counsel.  First, the Behrmanns have consistently avoided the assertion of an advice of

counsel defense in response to the Show Cause Order.  Second, the Supreme Court has made it

clear that clients are responsible for their attorneys' errors.  *See Pioneer Inv. Servs. Co. v.*

*Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 396 (1993) ("we have held that clients must be

held accountable for the acts and omissions of their attorneys").  Accordingly, there is no

distinction to be made between the Behrmanns and their attorneys as Respondents to the Show

Cause Order.[10]

---

[10]   Who ultimately pays the contempt sanctions awarded herein is a matter to be determined between the
Behrmanns' and their counsel.  The sanctions are being awarded jointly and severally as against all of the
Respondents.

The Court will address each element of the Order to Show Cause, as follows:

1. *The Filing of the Complaint Against the Officers and Directors in Contravention of the Express Representations made by the Behrmanns' Counsel to the Court at the March 6, 2012, Hearing.*

The Court is deeply troubled that the Respondents would file the Complaint in light of Mr. Merrick's representation to the Court to the contrary. In his testimony, Mr. Merrick focused on the "there is no plan or intent" language of his representation to the Court, thereby implying that his representation was to the effect that there was no *present intent* to file a lawsuit. In Mr. Merrick's view, "things changed." Mr. Merrick's representation to the Court, however, was that the Respondents would not file a lawsuit "prior to this court ruling" on the validity of the underlying Release and Exculpation provisions in the confirmed Plan. There was no temporal limitation in Mr. Merrick's representation, and the Court accepted his representation.

Mr. Miller and Mr. Shendzielos, for their part, testified that they either didn't see, or they simply forgot about, Mr. Merrick's e-mail of March 6th which advised them of his representation to the Court. This testimony was unrebutted, and the Court accepts that both attorneys were busy preparing for the start of the Baker trial in California and probably didn't see the e-mail, or if they did, they did not focus on it at the time.

Despite the disturbing sequence of events in the filing of the Complaint—after Mr. Merrick's representation and before the Court ruled on the Release and Exculpation provisions—the Court finds with respect to Mr. Merrick's representation that the Respondents have not violated an unambiguous Order of the Court. *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) ("Civil contempt is an appropriate sanction if we can point to an order of this Court which 'set[s] forth in specific detail an unequivocal command' which a party has violated.") The Court will not hold the Respondents in contempt for having filed the Complaint

21

in contravention of Mr. Merrick's representation to the Court.  Further, in light of the Court's

disposition of the remainder of the Show Cause Order, below, the Court finds it unnecessary to

impose any sanctions for the filing of the Complaint and the Amended Complaint in

contravention of Mr. Merrick's representation to the Court.  Accordingly, paragraph 40(A) of the

Show Cause Order will be dismissed.

> 2. *The Filing of the Amended Complaint, Which Included Exculpated Claims against the Officers and Directors, Without this Court's Prior Permission, After the Court's Memorandum Opinion and Order of August 27, 2012, Reinstated the Exculpation Provisions of the Confirmed Plan, Violated Section 7.18 of the Confirmed Plan of Reorganization and Paragraph 7 of the Confirmation Order.*

The Amended Complaint unquestionably includes Exculpated claims.  *See* Amended

Complaint, ¶¶ 135-150 ("Specific Facts Involving Bankruptcy Fraud").[11]  The Court accepts the

Respondents' argument that the original Complaint of June 28, 2012, was filed at a time when

the parties were in a "gray area."  At that time, the Fourth Circuit had remanded the case, but this

Court had not yet ruled on the enforceability of the Release and Exculpation provisions of the

confirmed Plan.  However, on August 27, 2012, this Court issued its Memorandum Opinion and

Order in which it unambiguously held the Exculpation provisions to be enforceable.  The

Respondents filed the Amended Complaint on October 19, 2012, without first seeking leave of

this Court.  This was in direct violation of the Court's Memorandum Opinion and Order of

August 27, 2012, and the Confirmation Order.

The Behrmanns did not appeal the Court's Opinion and Order of August 27, 2012.  The

Court's ruling with respect to the efficacy of the Exculpation provisions, therefore, was final and

not appealable at the time the Amended Complaint was filed.  In fact, the Court's ruling with

---

[11]    The Behrmanns acknowledged that the Amended Complaint included Exculpated claims, when they filed their Motion entitled "Motion for Leave to Pursue Litigation Claims Against Members of the Houk Family for Claims Arising During the Bankruptcy Exculpation Period."  Docket No. 1035.

respect to the Exculpation provisions has never been appealed.  As of the filing of the Amended

Complaint, there was no "gray area," with respect to the Exculpated claims.  Although, the

Respondents filed a Motion for Leave to file the Amended Complaint on October 22, 2012,

(Docket No. 1035), which was denied without prejudice to being renewed, this does not excuse

the filing of the Amended Complaint in violation of this Court's Orders.[12]

In essence, it really did not matter that any statutes of limitations were about to run on the

Exculpated claims, as suggested by Mr. Miller and Mr. Schendzielos.  The Court had already

upheld the enforceability of the Exculpation provisions, and the Behrmanns elected not to appeal

that decision.  While Mr. Miller and Mr. Schendzielos took pains to examine whether the statutes

of limitations were about to run, they appear never to have spent any time researching or

analyzing whether the claims asserted in the Amended Complaint were Exculpated claims or not.

Whether or not any statutes of limitations would run in theory was rendered completely

irrelevant by the fact that this Court had stated in plain terms "you may not file any Exculpated

claims without leave of this Court," in its Memorandum Opinion and Order of August 27, 2012.

The Court also refuses to accept the Behrmanns' argument that "the third-party release

contained in Section 7.19 of the Plan is limited to a release of claims against NHF's directors and

officers resulting from acts and omissions in connection with, relating to, or arising out of

activities designed to further NHF's 'charitable mission.'"  Response in Opposition, Docket No.

1054 at 18.  Here, the Behrmanns are relying on the wrong section of the Plan.  Section 7.19 is

the release of the Debtor's officers and directors for pre-petition conduct, which the Court struck

in its Memorandum Opinion and Order of August 27, 2012.  The filing of the Amended

---

[12]   The Respondents have since renewed their Motion for leave to file and pursue the Exculpated claims, in light of
the District Court having affirmed the Court's Memorandum Opinion and Order of August 27, 2012.  Docket No.
1143.  In connection with this Motion, the Respondents have proffered a Second Amended Complaint (Docket No.
1180), which the Court has reviewed.  The Court has denied this Motion, by separate Order.

Complaint violated the Exculpation provision of Section 7.21, not the Release provision of Section 7.19.

The Court also finds no support for the argument advanced by the Respondents that, with respect to the assigned claims, the Behrmanns are entitled to rely on the Assignors' alleged lack of notice of the NHF bankruptcy case. The Behrmanns inarguably were on notice of the filing of the case and the proceedings therein. They cannot be heard to claim a lack of knowledge, based on their Assignors' purported lack of knowledge of the case.[13]

The Court's August 27, 2012, Memorandum Opinion and Order granted the Respondents leave to pursue the pre-petition Released claims as against the Officers and Directors. Rather than file a relatively simple Complaint alleging that the Officers and Directors defrauded them into giving NHF money pre-petition, which they would have been entitled to do, the Respondents chose to file a 36 page, ten Count, Complaint, and then an 87 page, ten Count, First Amended Complaint, both of which included Exculpated claims. In his testimony, Mr. Schendzielos stated that they were trying to "draft around" the Exculpation provisions of the Plan, or words to that effect. The Court, though, looks to the substance of the Amended Complaint. At the end of the day, some things cannot be drafted around. The Exculpation provision of the confirmed Plan is one of them.

The Court finds that the Respondents are in contempt of Court for having filed the Amended Complaint, which included Exculpated claims, in violation of the Confirmation Order and this Court's Order of August 27, 2012, holding that the Exculpation provision of the confirmed Plan continued to be enforceable.

---

[13] In fact, the allegation that the Assignors lacked knowledge of the bankruptcy case was dropped from the Amended Complaint. *Compare* Complaint ¶ 58 ("[The Assignors] and others similarly situated were not given notice of the bankruptcy filing and were not given the opportunity to submit their claims to the bankruptcy court"), *with* Amended Complaint ¶¶ 170-184 ("Background of Assigned Claims").

3.  *The Filing of the Complaint Against the Debtor Violated Section 7.18 of the Confirmed Plan of Reorganization, Paragraph 7 of the Confirmation Order and 11 U.S.C. § 1141(d)(1).*

The Court finds that the Respondents violated the Confirmation Order by filing the Complaint against the Debtor.  Further, the Court finds that the Respondents are in violation of Section 1141(d)(1) of the Bankruptcy Code which provides:

> Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
> (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—
> (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this titled;
> (ii) such claim is allowed under section 502 of this title; or
> (iii) the holder of such claim has accepted the plan; and
> (B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

The Court finds no support for the primary argument advanced by the Respondents that, because the Fourth Circuit had "vacated" the Confirmation Order, there was no discharge injunction in place.  First, confirmation of the Plan itself was never an issue on appeal to the District Court or the Fourth Circuit.  The only issues on appeal related to enforceability of the Release and Exculpation provisions of the confirmed Plan.  In fact, the Respondents have consistently argued to the District Court and to the Fourth Circuit that the terms of the Plan are severable, so that excising the Release and Exculpation provisions would have no effect on the Plan itself.  The Behrmanns themselves were the appellants; they and their counsel, Mr. Miller and Mr. Schendzielos, should have understood what the issues were on appeal to the Fourth Circuit and the legal positions they mapped out before the Fourth Circuit.

Second, Mr. Merrick, whom it must be remembered has represented the Behrmanns

throughout this bankruptcy case, represented to the Court at the hearing on December 4, 2012,

that the Confirmation Order was *not* vacated in its entirety:

> THE COURT:  So, when the 4th Circuit vacated the judgment, you're not suggesting that the confirmation order was vacated; are you?
>
> MR. MERRICK:  I think that if one is being conceptually honest and employing conceptual integrity, that is, the challenge to 7.19 to 7.21 and the 4th Circuit order addresses the federal district court judgment and the 4th Circuit says, we vacate the judgment.  The challenge was to 7.19 through 7.21.
>
> So, in answer to your question, I think that it's a potential way of looking at it but probably the better way of looking at it is that the 4th Circuit vacated the order of confirmation insofar as it approved the inclusion of 7.19 through 7.21 of the confirmed plan, and if that's parlor games and trickery and sleight of hand before this court, I'm guilty.
>
> THE COURT:  Well, but I just want to understand your position.  You're not suggesting that the confirmation order in its entirety was vacated?
>
> MR. MERRICK: No.

Docket No. 1063, Transcript 12/4/2012 at 68:16-69:11.  The Court simply cannot square the

Behrmanns' position on December 4, 2012, with their current position, that the Fourth Circuit

had vacated the Confirmation Order in its entirety.

Third, even if the Respondents' newly changed position were legally correct, and the

Fourth Circuit had vacated the entire Confirmation Order, then the automatic stay of Section

362(a) would have been applicable, and the Respondents still would have been stayed from filing

the Complaint.  Section 362(a)(1) of the Bankruptcy Code prohibits "the commencement or

continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that

was or could have been commenced before the commencement of the case."  11 U.S.C. §

362(a)(1).  NHF inarguably was still in bankruptcy after the remand from the Fourth Circuit.

The Respondents' argument here would only exchange the words "violation of the automatic

stay" for "violation of the discharge injunction," a meaningless substitution under the

circumstances.  If the Respondents believed that the Confirmation Order was vacated in its

entirety, then they should have heeded Judge Mayer's admonition:

> One cardinal rule of bankruptcy practitioners is, if there is doubt as to whether the automatic stay applies, file a motion. Assert that the stay does not apply and request, in the alternative, that if it does apply, that relief from it be granted. Or, simply file a motion for relief from the automatic stay.

*In re Gordon Properties, LLC*, 460 B.R. 681, 699 (Bankr. E.D. Va. 2011).

The Court finds that the filing of the Complaint, as well as the filing of the Amended

Complaint discussed below, represented nothing more than an attempt to dress up pre-petition

and pre-confirmation claims in post-confirmation clothing.  *See Grady v. A.H. Robins Co*., 839

F.2d 198 (4th Cir. 1988) (adopting the conduct test, to determine whether a claim arises pre-

petition or post-petition); *see also Holcombe v. US Airways, Inc*., 369 F. App'x 424, 429 (4th

Cir. 2010) ("Holcombe's failure to file a proof of claim after receiving notice in the first US

Airways bankruptcy case means her claim as to any pre-confirmation actions did not survive the

discharge").

The Court finds that the Respondents violated the Confirmation Order and the terms of

11 U.S.C. § 1141 by filing the Complaint against the Debtor.

> 4. *The Filing of the Amended Complaint against the Debtor Violated Section 7.18 of the Confirmed Plan of Reorganization, Paragraph 7 of the Confirmation Order and 11 U.S.C. § 1141(d)(1).*

The Court finds that the Respondents violated the Confirmation Order by filing the

Amended Complaint against the Debtor.  As noted with respect to the filing of the Complaint,

confirmation of the Plan and the discharge of the Debtor were never issues on appeal before the

Fourth Circuit.  The Court specifically rejects the Respondents' argument that the filing of the

Complaint and the Amended Complaint were necessary in order to allege "post-confirmation

conduct in abetting the [RICO] enterprise."  Attorney Respondents' Response to Show Cause

Order, Docket No. 1136, p. 17.  First, the Attorney Respondents state in the very same brief:

*"The vast majority of the allegations in the Amended Complaint fall outside the scope of the*

*Exculpation provision because they occurred pre-petition* and/or are actions related to the

conduct of NHF's business operations as opposed to acts or omissions in its bankruptcy case."

*Id.* at 13 (emphasis added).  The Court does not see how the Respondents can claim that the "vast

majority" of their allegations "occurred pre-petition," while at the same time argue that the

allegations against NHF involve the continuation, post-confirmation, of a RICO enterprise.

Second, in reviewing the Amended Complaint, the allegations are almost exclusively

allegations of pre-confirmation conduct.  Virtually nothing is alleged to have happened post-

confirmation.  The only allegations of post-confirmation conduct in the Amended Complaint are

contained in paragraphs 9 ("In 2011 . . ."), 156 ("on September 29, 2010 . . ."), 157 ("On

November 30, 2010 . . .") and 158 ("on December 13, 2010 . . .").  The Behrmanns do not allege,

nor could they, that they were harmed by any post-confirmation conduct of the Debtor.  The

Behrmanns parted with their money before NHF ever filed for bankruptcy.  They claim that they

were defrauded by the Houks.  It is this claim—a claim for pre-petition conduct by the

individuals—that this Court and the District Court have allowed to go forward.  The Behrmanns

cannot possibly allege any harm that has accrued to them by virtue of the so-called post-

confirmation continuation of the alleged RICO enterprise.[14]

The Respondents have failed to cite a single case that supports the proposition that

alleging the post-confirmation continuation of a RICO enterprise is sufficient to circumvent the

---

[14]   Both the Complaint and the Amended Complaint allege: "the Behrmanns reasonably and justifiably chose to repose special trust and confidence in Houk and the other Defendants, and the Behrmanns continued to do so *until NHF filed for bankruptcy relief in January 2009.*"  Complaint, ¶ 39; Amended Complaint ¶ 162 (emphasis added).

28

discharge injunction of a confirmed Chapter 11 Plan.  The only case cited by the Respondents in

support of their "post-confirmation RICO enterprise" theory is *Paul v. Inglehart (In re Paul),*

534 F.3d 1303 (10th Cir. 2008).  First, the *Paul* case involved claims in which the individual

Debtors were alleged to have committed wrongdoing in connection with the winding down of a

non-Debtor entity (Peak Sports), after the individuals were discharged in bankruptcy.  This is

precisely the opposite of the situation in this case, where NHF is the discharged Debtor, the

Directors and Officers are not in bankruptcy, and the claim arose before NHF filed its

bankruptcy case.

Second, the *Paul* case primarily involved the ability to serve discovery on parties after

their discharge in bankruptcy.  *See id*. at 1307 ("Although § 524(a)(2) prohibits actions brought

to collect a discharged debt from the debtor, it permits suits—even those brought to collect on

debts a debtor has discharged—that formally name the debtor as a defendant but are brought to

collect from a third party. . . . And requiring a debtor to bear such collateral burdens of litigation

as those relating to discovery (as opposed to the actual defense of the action and potential

liability for the judgment) does not run afoul of § 524(a)(2).")  The instant case does not involve

discovery obligations.  NHF has been sued not as a nominal defendant, but as a real one, from

whom the Behrmanns would seek to collect their judgment, were they successful in the litigation.

Third, *Paul* is distinguishable because it involved the discharge of two individuals in

Chapter 7.  As noted in the Tenth Circuit's opinion, a Chapter 7 bankruptcy discharges all debts

"that arose before the date of the order for relief."  11 U.S.C. § 727(b).  In this case, involving

the confirmation of a Chapter 11 Plan, the Debtor was discharged of all debts that "arose before

the date of . . . confirmation."  11 U.S.C. § 1141(d)(1)(A).  *See also* Plan, Docket No. 665,

Section 7.18 ("entry of the Confirmation Order acts as a discharge of all Claims against, liens on,

29

and interests in the Debtor, the Debtor's assets and properties, arising at any time before the

Effective Date").

The Court also finds that the Respondents' argument that they were entitled to file the

Amended Complaint against the Debtor because it contained "alter ego" allegations to be

without support.  It is clear that NHF is more than a nominal defendant in the Amended

Complaint, and that the Respondents sought money damages directly from NHF.  The presence

of the alter ego allegations does not serve to avoid a finding of contempt for the filing of the

Amended Complaint.

The Court also rejects the argument advanced by the Respondents that the "carve out"

language of the Amended Complaint somehow avoids a finding of contempt.  The allegations are

in the Amended Complaint precisely because the Respondents intend to present evidence of the

same to the jury.  The Court accepts that the trial judge can more than capably limit the evidence

that will be presented to the jury.  But, if the suggestion is that a critical element of the Plaintiffs'

case can be pleaded in the Amended Complaint, but *not* be presented to the jury, then the

Plaintiffs' case will fail for a failure to prove a necessary element at trial.

Finally, the Court most strongly rejects the argument advanced at footnote 5 of the

Respondents' Brief, that because they claim that the Confirmation Order was procured by fraud,

they are free to file their action against the Debtor, post-confirmation, citing *Bizzell v.*

*Hemingway,* 548 F.2d 505, 507-08 (4th Cir. 1977).  Attorney Respondents' Response to Show

Cause Order, Docket No. 1136, n.5.  *Bizzell* involved a case under the Bankruptcy Act, not under

Section 1144 of the Bankruptcy Code (Revocation of an Order of Confirmation).  It is difficult to

reconcile *Bizzell* with the Supreme Court's holding in *Travelers Indemnity Co. v. Bailey*, 557

U.S. 137 (2009), concerning the finality of confirmation Orders.  The Supreme Court held: "once

30

the 1986 Orders became final on direct review (whether or not proper exercises of bankruptcy

court jurisdiction and power), they became *res judicata* to the parties and those in privity with

them, not only as to every matter which was offered and received to sustain or defeat the claim

or demand, but as to any other admissible matter which might have been offered for that

purpose." *Id*. at 152 (internal quotation marks omitted).  Further, *Bizzell* involved the exercise of

discretion on the part of the District Court to entertain the claims, which the Fourth Circuit found

not to be an abuse of discretion.  This Court will decline to exercise whatever discretion it may

have to allow these claims to go forward against the Debtor.

If the Respondents believe that the Confirmation Order in this case should be vacated,

they can file a Motion to vacate it.[15]  The Respondents are not free, however, to file lawsuits in

other courts that contravene the Confirmation Order simply because they believe that the

Confirmation Order was the product of fraud.  *See In re Genesis Health Ventures, Inc.,* 340 B.R.

729, 733 (D. Del. 2006) ("While on its face, § 1144 appears to apply only to efforts to revoke a

confirmation order, courts have adopted a wider approach, and have applied the bar in § 1144

when the complaint in question appears 'to do indirectly what [the plaintiffs] no longer may do

directly' because of that statutory bar");  *In re Cal. Litfunding, a Nev. Corp*., 360 B.R. 310, 317-

18 (Bankr. C.D. Cal. 2007) ("creditors may not attack confirmation orders by simply

characterizing their attempt as an independent cause of action, rather than a motion to revoke the

order.")  The Court finds that the Complaint and the Amended Complaint are not independent

---

[15]   The Court need not decide at this juncture whether the 180 day time limit in Section 1144 of the Bankruptcy
Code would bar such a Motion, or whether there may be circumstances that would warrant the consideration of a
Motion under Rule 60(b)(3), notwithstanding the 180 day time limit contained in Section 1144.  *See United Student
Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, n.9 (2010) (declining to decide whether the 180 day time limit for
revocation of an Order confirming a Chapter 13 Plan in Bankruptcy Code Section 1330(a)  limits the Court's ability
to entertain a Rule 60(b)(4) Motion).

causes of action; they are direct actions against the Debtor that plainly contravene the

confirmation Order in this case.[16]

     *5.   Harm to the Debtor.*

     Having found the existence of two valid Orders (the Confirmation Order and the Order of

August 27, 2012) of which the Respondents had actual or constructive knowledge, that the

Orders were in the Debtor's favor, and that the Respondents violated the terms of the Orders, the

Court turns to the issue of harm to the Debtor.  Remedies for contempt include ordering the

contemnor to reimburse the complainant for losses sustained, including reasonable attorney's

fees.  *In re Gen. Motors Corp.,* 61 F.3d at 259.  Section 105(a) of the Bankruptcy Code also

authorizes a bankruptcy court to award attorney's fees upon a finding of contempt.  *In re Cherry*,

247 B.R. at 186-87; *In re Rountree*, 448 B.R. at 416.

     The Respondents argue that the Debtor really hasn't been harmed at all, or has been

harmed minimally, because they have agreed to stay the California action.  The Court cannot

accept this argument.  First, the Respondents agreed to a stay as to the Officers and Directors, but

not as to the Debtor, NHF.  The Respondents asserted, unilaterally, that Foley & Lardner had a

conflict of interest, and therefore, the Respondents would not negotiate with Foley as to a stay in

favor of NHF.  *See* NHF Ex. 5 (Mr. Miller: "we believe there exists an ethical conflict that

prevents us from further communicating with you regarding your clients' request for a stay, as

you would be negotiating for both your firm and your clients); Respondents' Ex. I at 7

(Plaintiff's Status Report) ("Plaintiffs believe there exists both an ethical and practical conflict

---

[16]  The Respondents also argue that the California action is nothing more than "petitioning activity," and protected
by the *Noerr-Pennington* doctrine.  Attorney Respondents' Response to Show Cause Order, Docket No. 1136, n.5.  If
the Respondents' position were correct, then any collection activity that involved court processes—lawsuits,
garnishments, debtor's interrogatories, levies and attachments—would be protected, and the automatic stay and the
discharge injunction would be rendered utterly meaningless.

which negates Plaintiffs' ability to enter into agreements with NHF Debtor Defendants until they

obtain new counsel.")  The Respondents cannot be heard to say that they were willing to agree to

a stay of the litigation, when in fact, Respondents refused even to discuss a stay with respect to

NHF, owing to the assertion of an alleged conflict of interest on the part of NHF's counsel.

More fundamentally, the Court is astonished that the Respondents haven't dismissed the

lawsuit as against NHF, despite the fact that the Debtor filed its Motion for Sanctions on

November 14, 2012; the Court issued the Show Cause Order on December 20, 2012; and the

hearing on the Show Cause Order was scheduled for March 5, 2013 (later continued at the

request of the Respondents to May 1, 2013).  It is apparent to the Court that the Respondents

simply don't care that a Confirmation Order has been entered by this Court, or that the Court has

upheld the Exculpation provisions of the Plan in its August 27th Opinion and Order.  The

Respondents have consciously chosen to plow on with their litigation despite the two plain and

unambiguous Orders of this Court to the contrary.

Further, the Court questions the underlying premise that the Debtor should be satisfied

with a stay of the California action.  The Debtor is indisputably entitled to a dismissal of that

lawsuit, and the Officers and Directors are entitled to a dismissal of the Exculpated claims.  The

Debtor should not have had to litigate a two-day contempt hearing before this Court to gain that

result.  The Court holds that the Debtor has been harmed.

Having determined that the Debtor has been harmed, the Court must now assess the

reasonableness of the fees claimed.  *In re Gen. Motors Corp.*, 61 F.3d at 259-60.  The burden of

proof on the reasonableness of the attorneys' fees and costs rests with the movant.  *See Hensley*

*v. Eckerhart*, 461 U.S. 424, 437 (1983).  The Court finds that Ms. Morabito's hourly rate of

$680-690 is reasonable and is consistent with the rates charged by partners in comparable law

firms for work of this kind.  The Court also finds that Ms. Nelson's hourly rate of $470-$500 is

reasonable and is consistent with attorneys of her experience in a matter of this complexity.  The

Court also accepts that the relevant geographic market is the Washington, D.C., region, not the

Alexandria/Richmond Divisions of the Eastern District of Virginia.  The Court also finds that, in

defining the market, there is a market for legal services from national firms, of which Foley &

Lardner is one, for matters of complexity, of which this is one.

        The Court agrees with the Respondents that the fees charged for the Motion for Leave to

File the Exculpated Claims (totaling **$39,151**, NHF Ex. 27 at Ex. C) should not be included here.

The Respondents had the right to file that Motion at any time, and the filing of the two Motions

for Leave to File the Exculpated Claims does not amount to contempt of court in any way.

Similarly, the Respondents' Motion to Dissolve the Stay Pending Appeal, for which the fees

totaled **$31,201** (*id*.), cannot be awarded here.  The Respondents had the right to move to

dissolve the stay pending appeal.

        Still, simply deducting these categories of legal fees does not lead the Court to the correct

result.[17]  The Court finds that the attorney's fees and costs submitted by the Debtor are simply

out of proportion to what was at stake here.  The Court must consider the time expended in

relation to what was at issue in the matter.  *See Johnson v. Ga. Highway Express, Inc*., 488 F.2d

714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989);

*Barber v. Kimbrell's Inc*., 577 F.2d 216 (4th Cir. 1978).  Although hard fought by the

Respondents, at the end of the day, this entire matter was about a lawsuit that should not have

been filed against the Debtor, and should not have been filed against the Officers and Directors

---

[17]  In its closing argument, NHF's counsel, Ms. Morabito, suggested that the Court could deduct for these two
categories of fees, as well as **$7,789** in time for preparation of the fee statements, resulting in a revised request for an
award of **$688,172** in legal fees.

as to the Exculpated claims.  At the hearing on the Respondents' Motion to Continue, the

Debtor's counsel suggested that this essentially was a matter between the Court and the

Respondents, and that discovery was unnecessary.  Yet, given a continuance, the Debtor

proceeded with an enormous discovery effort, involving interrogatories, requests for production,

depositions of the Behrmanns and their attorneys, and a Motion to Compel involving the asserted

waiver of the attorney-client privilege and work product doctrine (on which NHF was not

successful).  As of February 8, 2013, NHF had incurred **$219,705** in legal fees.  NHF Ex. 24 at

Ex. B (Fees by Category).  The next day, on February 9th, the Court continued the Show Cause

hearing from the originally scheduled March 5, 2013, hearing date to May 1, 2013.  In the

intervening 56 days, NHF accrued an additional **$546,618** in fees ($763,322 minus $219,705), or

almost $10,000 *a day* ($9,761, to be precise).  As noted above, but for the floor rate, the

discounts and the write-offs, the legal fees would have exceeded $1,000,000.  After the write-

offs and discounts, the fees and expenses exceeded $766,000.  This is just too much.

Counsel's time records for most of 2012 are filled with blocked time entries.  *See, e.g.*,

10/31/12 (ELMH), 11/4/12 (ELMH), 11/14/12 (ELMH), 11/15/12 (ELMH), 12/7/12 (BJN),

11/27/12 (ELMH), 11/27/12 (BJN), 12/3/12 (ELMH), 12/3/12 (BJN), 12/14/12 (BJN), 12/15/12

(ELMH), 12/17/12 (BJN), 12/18/12 (ELMH) and 12/18/12 (BJN).  In blocked time, the Court

cannot determine the value of the service because the Court cannot discern whether the time

spent on any individual task was appropriate to the task.  *Ebersole v. Kline-Perry*, 2012 WL

4473247 at *5 (E.D. Va. Sept. 26, 2012) (noting that when faced with block billing, many courts

have applied a percentage reduction, and applying a 15% reduction for block billing).  Beginning

in early 2013, Foley & Lardner appears to have started to break down its time entries, in order to

avoid block billing.

There also are many instances in which multiple attorneys attended conferences.  *See, e.g.,* 11/27/12 (ELMH) ("meeting with Ms. B. Nelson") and 11/27/12 (BJN) ("Multiple conferences with Ms. E. Morabito"); 03/25/13 (HTFE) ("conference with Mr. C. Freitas and Ms. B. Nelson") and 03/25/13 (BJN) ("multiple conferences with Mr. C. Freitas and Mr. S. Scott"); 04/02/13 (CDFR) ("Conference with Ms. B. Nelson and Ms. E. Morabito") and 04/02/13 (BJN) ("multiple conferences with Ms. E Morabito and Mr. C. Freitas").

There are duplicate time entries in connection with all of the depositions taken in advance of the hearing on the contempt motion.  *See, e.g.,* 4/3/13 (BJN) ("Prepare for and participate in depositions of Ms. N. Behrmann and Mr. J. Behrmann") and 4/3/13 (ELMH) ("prepare for and conduct the depositions of Mr. and Mrs. Behrmann"); 4/4/13 (BJN) ("Prepare for and attend depositions of Mr. J. Miller and Mr. D. Schendzielos") and 4/4/13 (ELMH) ("prepare for and conduct deposition of Mr. D. Schendzielos and Mr. J. Miller"); 4/5/13 (BJN) ("Prepare for and participate in deposition of Glenn Merrick") and 4/5/13 ("Prepare for and conduct deposition of Mr. Merrick"); 4/11/13 (BJN) ("prepare for and attend Mr. D. Schendzielos' deposition") and 4/11/13 (ELMH) ("prepare for . . . [and] conduct deposition of Mr. D. Schendzielos").  The time entries for these two attorneys are in addition to numerous time entries for support personnel, who prepared documents and outlines for these depositions.

The Court further finds that the case was overstaffed.  The Court may reduce an award of fees in the event of overstaffing as well as exclude hours that are "excessive, redundant, or otherwise unnecessary."  *SunTrust Mortg., Inc. v. AIG United Guaranty Corp*., 2013 WL 870093 (E.D. Va. 2013); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 2013 WL 458532 (E.D. Va. 2013); *McAfee v. Boczar*, 2012 WL 5398807 at *11 (E.D. Va. 2012).  In its initial submission on fees, NHF identified four partners, four associates, one case manager and two

paralegals billing time to the file.  In its first Supplement, there were three partners, one senior

counsel and three associates on the case.  In its Second Supplement, there were two partners, two

associates, three paralegals, one project assistant and one research librarian billing on this file

(the Court questions whether it is appropriate to bill such professionals as case managers, project

assistants or research librarians).  In its Third Supplement, Foley & Lardner had two partners,

seven associates, one case manager, two paralegals and one project assistant, all with their

shoulders to the wheel.  This is simply too many professionals associated with the matter to be

compensable.

Finally, Mr. Gordon Davenport was brought into the case on April 3, 2013, a month

before the hearing was to begin (and three months after the Court issued its Show Cause Order).

The Court respects Mr. Davenport's abilities as a trial attorney, and no criticism of his

performance should be inferred.  However, the Court does not understand why he needed to be

brought into the case at this late stage.  His entry into the case a month before the show cause

hearing caused him to have to spend a great deal of time getting up to speed on the legal issues

and the factual underpinnings of the case.  *See, e.g.,* 4/3/13 (GD) ("Locate and review previous

research"); 4/3/13 (GD) ("Extended telephone conference with Ms. E. Morabito"); 4/3/13

("Review multiple briefs and pleadings relevant to the upcoming show cause hearing").

The Court has carefully reviewed the Debtor's submission with respect to its fees and

expenses.  Having done so, the Court will award the sum of **$250,000** for fees incurred.  The

Court will also award **$28,098.53** for expenses incurred, for a total of **$278,098.53.**  The amount

allowed for fees represents roughly one-third of the $766,000 requested.  At counsel's blended

hourly rate of $489, this works out to slightly more than 500 billable hours (511).  The Court will

allow approximately 100 billable hours for negotiating and obtaining the two stays in California,

37

and another 400 billable hours for this contempt matter, at the blended hourly rate of $489. This, the Court finds, is reasonable compensation to the Debtor for the harm suffered as a result of the filing of the Complaint and the Amended Complaint. This amount will be assessed against the Respondents, jointly and severally, and shall be payable within ten (10) days of the date of this Order, as reasonable compensation for the Debtor's legal fees and expenses in this matter.

      *6.    Punitive Damages.*

      Finally, the Court will address NHF's request for punitive damages. The Court questions whether punitive damages are available here. The Fourth Circuit noted in *General Motors*, "Generally, a compensatory sanction may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt fine become punitive in nature, which is not appropriate in a civil contempt proceeding." 61 F.3d at 259 (internal quotation marks omitted). Section 362(k) of the Bankruptcy Code provides for an award of punitive damages where appropriate, but Section 362 is limited to individuals (which NHF is not), and is limited to pre-confirmation violations of the automatic stay.

      Where punitive damages are available, the courts have generally required a finding of "egregious conduct," or "malevolent intent" in awarding punitive damages. *In re Cherry,* 247 B.R. at 190. Although the courts also have used the formulation "a clear disregard of the bankruptcy laws," *id.*, this articulation has the danger of converting every violation into one where punitive damages might be available. On balance, while the Court finds that the conduct of the Respondents was willful, the Court finds that the sanctions awarded herein are sufficient to compensate NHF for its losses, and to deter the Respondents from future violations. The Court will decline in the exercise of its discretion to award punitive damages in this case.

For the foregoing reasons, it is, hereby **ORDERED**:

1. Paragraph 40(A) of the Show Cause Order is dismissed.

2. The Respondents are adjudged to be in contempt of this Court's Confirmation Order and the Memorandum Opinion and Order of August 27, 2012, for the reasons stated in Paragraphs 40(B), (C) and (D) of the Show Cause Order, and for the reasons stated in this Opinion and Order.

3. The Respondents may purge themselves of the foregoing contempt finding by complying with the following paragraphs (a) and (b), within ten (10) days of the entry of this Order.

   a. First, the Respondents shall dismiss with prejudice the California federal action as against the Debtor, National Heritage Foundation, Inc., within ten (10) days of the entry of this Order.  Should the Respondents fail to do so, the Court hereby imposes a daily fine in the amount of **$500 per day**, payable to the Debtor, beginning on the eleventh (11th) day after the entry of this Opinion and Order, as against all of the Respondents, jointly and severally, until the case is dismissed against NHF with prejudice; and

   b. Second, the Respondents, within ten (10) days of the entry of this Order, shall move to amend their Amended Complaint in the California action to dismiss with prejudice all Exculpated claims as against the Debtor's Officers and Directors (the Houks and Jan Ridgely).  The Respondents shall diligently pursue this motion.  If the Respondents fail to comply with this requirement, the Court hereby imposes a daily fine in the amount of **$500 per day**, payable to the Debtor, beginning on the eleventh (11th) day after the entry of this

Opinion and Order, as against all of the Respondents, jointly and severally,

until compliance with this paragraph of the Opinion and Order.[18]

4.   The Court awards a judgment against all of the Respondents, jointly and severally, in

the amount of **$250,000** for the Debtor's attorney's fees and **$28,098.53** in costs in

this matter, totaling **$278,098.53**, payable within ten (10) days of the entry of this

Opinion and Order.

5.   NHF's request for an award of punitive damages is denied.

6.   The Clerk will mail copies, and serve by cm-ecf, copies of this Opinion and Order, to

all the parties, below.

Date: Jun 20 2013                        /s/ Brian F. Kenney
                                         Brian F. Kenney
                                         United States Bankruptcy Judge

Copies to:

Erika L. Morabito, Esquire
Foley & Lardner                          Entered on Docket:  June 21, 2013
3000 K Street, NW, Suite 600
Washington, DC 20007
Counsel for National Heritage Foundation

Joseph A. Guzinski, Esquire
Office of the United States Trustee
115 South Union Street, Room 210
Alexandria, VA 22314

Glenn W. Merrick, Esquire
G.W. Merrick & Associates, LLC
5445 DTC Parkway, Suite 912
Greenwood Village, CO 80111
Counsel for John Behrmann, Nancy Behrmann, Highbourne Foundation

---

[18]   The daily fines in paragraphs 3a and 3b above, will be cumulative.  The Respondents will be fined $1,000 per day in the event that they do not timely comply with paragraph 3a and paragraph 3b.

40

Greg Wade, Esquire
Wade, Friedman & Sutter, P.C.
616 N. Washington St.
Alexandria, VA 22314
Counsel for John Behrmann, Nancy Behrmann, Highbourne Foundation

Doug M. Foley, Esquire
McGuireWoods LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510-1655

John Behrmann
7054 Highbourne Lane
Dallastown, PA 17313

Nancy Behrmann
7054 Highbourne Lane
Dallastown, PA 17313

Jonathan D. Miller, Esq.
Nye, Peabody, Stirling, Hale & Miller, LLP
33 West Mission Street, Suite 201
Santa Barbara, California  93101

Nye, Peabody, Stirling, Hale & Miller, LLP
Attn: David L. Nye, Esq.
33 West Mission Street, Suite 201
Santa Barbara, California  93101

Daniel J. Schendzielos, Esq.
Schendzielos & Associates, LLC
8547 E. Arapahoe Road, Ste. J-534
Greenwood Village, CO 80112

Schendzielos & Associates, LLC
Attn: Daniel J. Schendzielos, Esq.
8547 E. Arapahoe Road, Ste. J-534
Greenwood Village, CO 80112

H. Jason Gold, Esquire
WILEY REIN LLP
7925 Jones Branch Drive, Suite 6200
McLean, Virginia 22102

Kevin R. McCarthy, Esquire
McCARTHY & WHITE, PLLC
1751 Pinnacle Drive, Suite 1115
McLean, Virginia 22102